## STATE v. GRANDBOUCHE*

(No. 1104; November 24, 1924; 230 Pac. 338)
Rehearing Denied: see 233 Pac. 532.

BANKS AND BANKING—MISAPPLICATION OF FUNDS—INTENT TO DEFRAUD—INDICTMENT AND INFORMATION—CRIMINAL LAW—VENUE OF CRIME—EVIDENCE OF INTENT—APPEAL AND ERROR—MOTION FOR NEW TRIAL—EXCEPTIONS.

1. Information, under Comp. St. 1920, § 7136, charging that defendants were directors of bank, and that they willfully misapplied funds thereof, with intent to defraud it, *held* not defective in failing to state that misapplication was made by defendants, in their official capacity.

2. An information charging directors of a bank with misapplication of its funds in a manner sufficient to apprise them of the crime charged *held*, sufficient.

3. The crime of willfully misapplying funds of a bank is completed when its funds are willfully and unlawfully misapplied with intent to defraud the bank, and the fact that the bank might recover the funds so misapplied is immaterial.

4. An information charging a willful misapplication of bank funds in drawing and paying two checks alleges a single transaction, viz, the misapplication of the bank's funds, constituting but one offense.

5. Where crime charged was willful misapplication of funds of bank in payment of two checks by draft out of bank's funds, it was committed when funds of bank were used in county of venue to pay checks, and hence prosecution was properly brought in county where draft was drawn and delivered.

6. Evidence *held* to show intent of directors to defraud bank by willful misapplication of funds.

7. Since motion for new trial is not contemplated by direct appeal, statute, overruling motion for new trial pro forma, was without prejudice, where direct appeal was taken, and all points raised in motion for new trial were embodied in specifications of error filed in trial court as provided by direct appeal statute.

8. Where motion for new trial and order thereon were not embodied in bill of exceptions, as required in proceedings in error, in such proceeding they could not be considered.

9. Error cannot be predicated on trial court's failure to charge as to law of reasonable doubt, in absence of exception to instructions given or exceptions to refusal to give requested instructions.

10. Technical rules controlling prosecution for embezzlement do not necessarily apply to prosecution of bank directors for "willful misapplication" of funds; statute making distinction between two offenses.

11. Defendant as director of C. bank in W. county issued checks drawn upon his bank, overdrawing his account. Upon presentation of checks to C. bank codefendant cashier issued and delivered draft for amount of checks upon bank in L. county, which bank paid it in L. county. *Held*, venue of prosecution lay in W. county, since conversion and misapplication of funds occurred when draft was issued and delivered.

*NOTE—See Headnotes (1) 7C J. p. 579 (1926 Anno); (2) 7 C. J. p. 579 (1926 Anno); (3) 7 C. J. p. 579 (1926 Anno); (4) 31 C. J. p. 761; (5) 16 C. J. p. 190 (1926 Anno); (6) 7 C. J. p. 579 (1926 Anno); (7) 17 C. J. p. 357 (1926 Anno); (8) 17 C. J. p. 177; (9) 17 C. J. p. 80.

Appeal from District Court, Weston County, James H. Burgess, Judge.

A. C. Grandbouche and Everett Nelson were convicted of willful misapplication of bank funds and they appeal. The material facts are stated in the opinion.

*James P. Kem* and *Henry Frawley* for appellants.

The information does not allege that the misappropriation was accomplished by defendants by virtue of their official capacity. It should have been quashed. Moore v. U. S. 16 S. C. R. 294; State v. Winstandley 57 N. E. 109; State v. Cadwallader 57 N. E. 512; Comp. Stats. 7136; An averment that the acts were done officially is essential; Overland Co. v. People 105 Am. St. Rep. 74; Flickenger v. U. S. 105 Fed. 1; Com. v. Kitner 37 Am; Rep. 692; U. S. v. Northway 7 S. P. Ct. 580; U. S. v. Britton 2 S. P. Ct. 512. The words "willfully misapplied" have no settled meaning. U. S. v. Norton 188 Fed. 256; Prettyman v. U. S. 180 Fed. 380; In felony cases the offense must be charged with clearness and certainty. U. S. v. Carll 105, U. S. 611; U. S. v. Morse 161 Fed. 429. Intent is an indispensable ingredient of the offense charged. U. S. v. Smith 152 Fed. 542. There was no misapplication of funds shown by the evidence. Prewitt v. Trimble 6 Am. St. Rep. 586; Morse Bank & Banking 135. The loan was made in good faith. Bank v. Pierie 82 Fed. 799; the funds were not sufficiently described; U. S. v. Hess, 8 Sup. Ct. 571; Keck v. U. S. 19 Sup. Ct. 254; Batchelor v. U. S. supra. There is no criminal liability for misapplication of funds arising from bad judgment or want of skill; Spering Appeal 10 Am. Rep. 684. Bank directors are liable only for fraud or gross negligence; Morawetz Sec. 552; such directors are mandatories acting gratutiously and only bound to apply ordinary skill and diligence; Taylor v. Co. 5 Ohio, 162; Franklin Co. v. Jenkins, 3 Wend. 130; Hodges v. Co. 53 Am. Dec. 624; Williams v. McDonald 37 N. J. E. 411. Guilt depends upon circumstances as they appear to accused; Dotson v. State 34 Am. Rep.

The question of intent is for the jury. An overdraft is a loan. U. S. v. Smith 155, Fed. 542. It was error to deny motion for new trial pro forma, Manhattan Co. v. Keeler 4 Pac. 143; K. C. Co. v. Ryan 30 Pac. 109; State v. Bridges, 29 Kan. 138; Larabee v. Hall 31 Pac. 1062; State v. Summers 24 Pac. 1099; Starrett v. Shaffer 61 Pac. 817; Ranney v. Co. 32 Atl. 810; the Weston County Court was without jurisdiction; no funds were misapplied in Weston County. The draft was drawn on a bank in Laramie County where the funds were. The checks were paid in Cheyenne, Laramie County; the draft was not paid in money belonging to the Upton Bank. Crime cannot be ambulatory. Crime must be punished where it is committed; Art. 1, Sec. 10, Const. People v. Mather, 4 Wend. 230; Com. v. Green, 17 Mass. 515; People v. Cummings 123 Cal. 269. A crime consisting of several acts, part in one county and part in another cannot be prosecuted in either, 2 Whar. Cr. 1208; State v. Fraher, 148 Mo. 143; U. S. v. Martindale, 146 Fed. 288. The Appellate Court should not hesitate to reverse the judgment, even though exceptions were not taken at the trial; Seng v. State (Wyo.) 122 Pac. 631; Patten v. U. S. 110 U. S. 374; Wilborg v. U. S. 163 U. S. 632; Anderson v. State, 126 Pac. 840; People v. Burk, 115 Pac. 1101.

*W. L. Walls*, Attorney General, for respondent.

The offense is statutory and a charge in the language of the statute is sufficient. It was unnecessary to charge that defendants drew and paid the checks in their official capacity as directors. State v. Beach, 147 Ind. 76; Ritter v. State, 111 Ind. 324; Evans v. U. S. 153, U. S. 584. A criminal act with intent to injure the bank was completed when a check known to be worthless is paid or passed to the credit of the depositor. Riegor v. U. S. 107 Fed. 916; U. S. v. Northway, 102 U. S. 327. The ingredients of the offense were fully set forth in the information. Claassen v. U. S. 142 U. S. 140. The drawing and payment of two checks did not constitute two separate and distinct offenses; Richey v. State, 201, Pac.

154; Prettyman v. U. S. 180 Fed. 35. The evidence of guilt was full and complete, and clearly established the offense charged; Lear v. U. S. 147 Fed. 359; error cannot be assigned upon instructions given or refused, in the absence of exceptions taken; Richey v. State supra; Dickerson v. State, 18 Wyo. 440; Loy v. State 26, Wyo. 381. A general verdict of guilty, is a verdict covering all that the information properly charges, Cook v. Ter. 3 Wyo. 116; People v. Marsh 6, Cal. 543; Richey v. State, supra. No exceptions were reserved for refusing to give requested instructions; Gardner v. State, 27 Wyo. 316; Dickerson v. State 18 Wyo. 472. Remarks of the Court were not prejudicial to defendants. No instructions were requested on burden of proof; Gardner v. State supra. Palmer v. State 9 Wyo. 40. People v. Raher, 92 Mich. 165. Failure to define reasonable doubt was not error; Winn. v. State 82, Wis. 572; People v. Marsh, 72 Cal. 46; State v. Brooks, 92 Mo. 542; Nead v. State 53, N. J. L. 601; Loy v. State 26 Wyo. 321; The Weston County Court had jurisdiction. The offense was completed in Weston County, by the payment of the checks by draft. Burton v. U. S. 196 U. S. 283; State v. Smith, 144 N. W. 32. The case was brought to the Supreme Court on appeal, and a motion for new trial was unnecessary.

TIDBALL, District Judge.

The appellants Grandbouche and Nelson, hereinafter referred to as defendants, were convicted in the District Court of Weston County of violating Section 7136, Wyoming Compiled Statutes of 1920, and were sentenced to a term in the penitentiary, and have appealed from that judgment to this court.

The information under which defendants were convicted reads as follows:

INFORMATION.

Comes now David A. Fakler, County and Prosecuting Attorney of Weston County, in the State of Wyoming, and

in the name and by the authority of the State of Wyoming, informs the Court and gives the Court to understand that A. C. Grandbouche and Everett Nelson, both of the County aforesaid, on the 18th day of October in the year of our Lord one thousand nine hundred and twenty-one, at the said Weston County in the State of Wyoming, did then and there at the time and place aforesaid, wilfully and unlawfully misapply of the funds and money the property of the Citizens State Bank of Upton, the sum of Five thousand Dollars in lawful money of the United States, and did, then and there, convert the said sum of money to their own use with intent then and there to wilfully and unlawfully injure and defraud the said Citizens State Bank of Upton, aforesaid, as follows, to-wit:

That on the 18th day of October, in the year of our Lord one thousand nine hundred and twenty-one, and prior thereto, the Citizens State Bank of Upton, was a banking corporation, duly organized and existing under and by virtue of the laws of the State of Wyoming, and as such then and there engaged in transacting a general banking business at Upton, Weston County, Wyoming, and that the said Everett Nelson and the said A. C. Grandbouche were each then and there, and had been for sometime prior thereto, directors of the bank aforesaid; that on the 15th day of October, in the year of our Lord one thousand nine hundred and twenty-one, the said A. C. Grandbouche then and there, well knowing that he had no money or funds on deposit, or subject to check, in the bank aforesaid, to pay any check that he might draw in any sum on said bank, knowingly, wilfully and unlawfully drew two certain checks on the Bank aforesaid dated on that day for the sum of Twenty-five Hundred Dollars, each, payable to one H. B. Shields, and then and there uttered the said checks by delivering the same to the said H. B. Shields in payment to the said H. B. Shields of some obligation to your informant unknown; that thereafter, and on the 18th day of October, in the year of our Lord one thousand nine hundred and twen-

ty-one, after the said checks had been so drawn and uttered as aforesaid by the said A. C. Grandbouche aforesaid, the said checks were presented for payment by the Bank of Upton to the said Citizens State Bank of Upton, and when so presented, there was no money or funds on deposit in said Citizens State Bank of Upton to the credit of the said A. C. Grandbouche aforesaid subject to check or at all with which to meet or pay the said checks, all of which was then and there well known to the said Everett Nelson and the said A. C. Grandbouche, but that, notwithstanding such knowledge on the part of the said Everett Nelson and A. C. Grandbouche aforesaid, the said Everett Nelson, then and there acting jointly and in a conspiracy with the said A. C. Grandbouche to injure and defraud the said Citizens State Bank of Upton, did then and there wilfully and unlawfully cause the said two false, fraudulent and worthless checks in the said sum of Twenty-five Hundred Dollars each, or Five Thousand Dollars in all, so wrongfully and fraudulently drawn and uttered by the said A. C. Grandbouche as aforesaid, upon the said Citizens State Bank of Upton, as aforesaid, to be fully paid out of the funds and money of the Citizens State Bank of Upton, and that the said Everett Nelson and A. C. Grandbouche aforesaid, then and there at the time and place aforesaid, and while acting in concert and conspiring together to injure and defraud the said Citizens State Bank of Upton, as aforesaid, did wilfully, wrongfully and feloniously, by the manner and means aforesaid, at the time and place aforesaid, misapply of the said money and property of the Citizens State Bank of Upton, aforesaid, the said sum of Five Thousand Dollars, by withdrawing said sum of money from said bank by means of said false, fraudulent and worthless checks aforesaid, and then and there and thereby converting the same to their own use, with intent then and there to wilfully and unlawfully injure and defraud the said bank out of the said sum of Five Thousand Dollars, lawful money of the United States, contrary to the form of the Statute in such case

made and provided, and against the peace and dignity of the State of Wyoming.

Section 7136, Wyo. C. S. 1920 reads as follows:

"Every president, director, cashier, teller, clerk or agent of any banking association who shall embezzle, abstract or wilfully misapply any of the moneys, funds or credits of such association, or shall issue or put forth any certificate of deposit, draw any order, bill of exchange, make any acceptance, assign any note, bond, draft, bill of exchange, mortgage, judgment or decree; or shall make any false entry on any book, report or statement of the association, with intent in either case to injure or defraud such association, or to injure or defraud any other company, body corporate or politic, or any individual person, or to deceive any officer or agent appointed to inspect the affairs of any banking association in this state, shall be deemed guilty of a felony, and upon conviction thereof shall be confined in the penitentiary at hard labor not more than ten years."

In order to discuss intelligibly the defendants' several assignments of error, a brief statement of the facts in the case, as disclosed by the evidence, is necessary. On, and for sometime prior to, October 18th, 1921, defendants were directors of the Citizens State Bank of Upton, the bank being located at Upton, in Weston County, and defendant Nelson was cashier and vice president and in active charge of the bank. On or about October 15th, 1921, defendant Grandbouche agreed with one H. B. Shields to purchase for $17,000 Shield's stock in the People's Bank of Moorcroft, this bank being in Crook County. As part payment for the stock in the Moorcroft bank, defendant Grandbouche delivered to Shields at Moorcroft two checks for $2,500 each drawn by Grandbouche on the Citizens State Bank of Upton, payable to Shields. The remainder of the consideration, $12,000, was paid by note. The two checks were deposited by Shields in the Bank of Gillette and Shields got the money, and assigned a part of the stock in the Moor-

croft bank to Grandbouche, and, at Grandbouche's direction, a portion was assigned to defendant Nelson and a portion to others. The $12,000 note was given by Grandbouche as part consideration for the bank stock was secured by collateral, a part of the collateral being a $2,000 note signed by defendant Nelson and payable to defendant Grandbouche and in turn secured by stock in the Citizens State Bank of Upton.

On October 15th, 1921, the day the two $2,500 checks were given, Grandbouche's account in the Citizens State Bank of Upton was overdrawn $124.55, and on October 18th, the day the checks were paid by the Citizens State Bank of Upton, it was overdrawn $176.25, and was overdrawn at all times between the 15th and the 26th of October, the day the bank closed.

On October 18th, 1921, the two Grandbouche checks were presented to the Citizens State Bank of Upton for payment. At that time, one Charles Sleichter was clerk and assistant cashier of the Citizens State Bank of Upton, receiving his instructions principally from defendant Nelson but occasionally from defendant Grandbouche. The two $2,500 checks came to Sleichter's attention through the Bank of Upton, a second bank doing business at Upton, as clearings for the day's business, the Bank of Upton being the correspondent through which the bank of Gillette, which had previously cashed the two checks, did business in Upton. Mr. Sleichter telephoned defendant Nelson, who was in Moorcroft, and asked him what was to be done with the two Grandbouche checks, and was told by Nelson to pay them and carry them on the bank books as cash, defendant Nelson telling Sleichter in that conversation that Grandbouche had the ''stuff in his pocket'' to take care of the checks. A draft was drawn by Sleichter, pursuant to Nelson's instructions, on the Citizens National Bank of Cheyenne, in which bank the Citizens State Bank of Upton had an account subject to draft, in a sum sufficient to cover that day's business with the Bank of Upton, including the two

Grandbouche checks, and was delivered to the bank of Upton, and afterwards in due course of mail presented to the Cheyenne bank and paid, and thereafter the two Grandbouche checks were carried in the bank as cash, not being charged to Grandbouche's account, until the bank was closed by the State Examiner on October 26th, 1921, this arrangement being carried out under instructions from defendant Nelson. At the time of the transaction of October 18th, the Citizens State Bank of Upton had actual cash on hand in the sum of $537.18, and Grandbouche's account was overdrawn as above stated. On October 19th, defendant Nelson returned to the Citizens State Bank of Upton and then told Sleichter that Grandbouche would be down right away with the money to take care of the two checks and in the meantime to carry them as cash. The same day, October 19th, a state bank examiner, Grier, was in the Citizens State Bank of Upton and Nelson made the same statements to Grier regarding Grandbouche's taking care of the checks, stating to Grier that Grandbouche had the ''stuff in his pocket'' to take care of the checks, and would be down the next day and take care of them. On October 24th or 25th, Grier had another conversation with Grandbouche at the Citizens State Bank of Upton in which conversation Grier told Grandbouche that the two checks would have to be ''fixed up,'' and Grandbouche replied that if they would give him two or three hours he could probably raise the cash. Grandbouche returned in three or four hours with a letter from Mark Shields of the Bank of Gillette stating he would loan Grandbouche $5,000 if Grandbouche would put up some of the notes of the Upton Bank as collateral. Grier refused to allow this to be done. Grandbouche then left again to raise the $5,000 but did not return with it, and the bank was closed October 26th. On October 18th, when the two Grandbouche checks were cashed, there was a $3,700 note that the Citizens State Bank of Upton had sent to the Citizens National Bank at Cheyenne to be discounted and credited to the Upton bank's account there. The Chey-

enne bank had refused this credit, which resulted in an overdraft in the Cheyenne bank. However, the Upton bank gave itself credit on its books for the $3,700 note. This note, together with the two Grandbouche checks carried as cash, deducted from all the assets of the Upton bank everywhere left that bank with its cash reserve and funds entirely exhausted—in fact, $5.00 less than nothing. On October 24th or 25th, in a conversation with the cashier of the Citizens National Bank of Cheyenne, defendant Nelson said, in discussing the bank situation, that he had been fooled.

The above is a brief statement of the State's testimony. The defendant's testimony contradicts very little of the above, except by way of denial of certain of the conversations above enumerated. The defendants claimed that Nelson was not associated with Grandbouche in the purchase of the Moorcroft bank stock, but took the shares assigned to him as security for a loan of $5,000 which Nelson, as cashier, was to make to Grandbouche from the Upton bank to take care of the two $2,500 checks. They claimed that they thoroughly examined the Moorcroft bank before the purchase of the stock and found it in good condition, the stock being worth about $130 per share; that they were acting under advice of counsel as to handling the Moorcroft bank purchase; that defendant Nelson was to be president and have charge of the Moorcroft bank until the $5,000 loan from the Citizens State Bank of Upton to Grandbouche should be repaid; that complete arrangements had been made with Nelson for the $5,000 loan before the checks were given to Shields; that the security, consisting of the Moorcroft bank stock, had been delivered to Nelson; that neither defendant had any intent to defraud the Upton bank; that at the time of the deal the Upton bank was in a "good thrifty condition;" that during the time of negotiating the purchase of the Moorcroft bank stock the Upton bank was expecting some deposits of around $5,000; that no note was made by Grandbouche and the certificates of stock in the Moorcroft bank were not attached to the two $2,500 checks

of Grandbouche because the certificates were not properly made out; the transaction was not explained to Grier, the bank examiner, because Grier didn't give Nelson time to explain. There was also testimony from several witnesses as to the good reputation of defendants.

Without going into details further as to the evidence in the case, it tends strongly to show that Grandbouche, when he drew the two checks, was insolvent and that the Citizens State Bank of Upton was insolvent and in failing circumstances; and conclusively proves that Grandbouche's account was overdrawn when he gave the two checks, and that the Citizens State Bank of Upton did not have $5,000 to loan. The evidence of the defendants also fails to explain in a satisfactory manner why the loan of $5,000 was not completed by the giving of the note and attaching the stock of the Moorcroft bank thereto as security. The evidence leaves a strong impression, to say the least, that Nelson was a purchaser of this stock with Grandbouche, that no loan was ever contemplated, and that the transaction was carried out exactly as Nelson and Grandbouche intended it should be.

There are thirty-one assignments of error, but as only seven of the thirty-one are discussed in appellant's brief, it is necessary for us to consider only the seven discussed. They are:

1. The information is insufficient in that it does not aver that the misapplication of funds was made by defendants in their official capacity as directors.

2. The words "wilfully misapplied" as used in the information are not sufficient, as the manner in which the misapplication was made must be shown.

3. The information charges two offenses inasmuch as it avers the drawing and payment of two checks, and this should be alleged in two counts.

4. The offense, if any, was not committed in Weston County, but was committed either in Crook County, where the checks were delivered, or in Laramie County, where the

draft was paid, and hence the court sitting in Weston County had no jurisdiction.

5.   The verdict is not sustained by sufficient evidence, inasmuch as intent to defraud was not shown, but, on the contrary defendants' good faith is shown by the evidence.

6.   The court overruled the motion for new trial pro forma without giving defendants an opportunity to be heard.

7.   The trial court failed to charge the jury as to the law of reasonable doubt.

The sufficiency of the information was attacked in the trial court by motion to quash, plea in abatement, demurrer, and motion in arrest of judgment.

The defendants, to uphold their contention that the information was defective, in failing to state that the misapplication of funds was made by defendants in their official capacity, cite the following cases: Moore vs. U. S. 160 U. S. 268; 16 S. Ct. 274, 40 L. ed. 422; State vs. Winstandley, 154 Ind. 443; 57 N. E. 109; U. S. vs. Northway, 120 U. S. 327, 7 Sup. Ct. Rep. 580, 30 L. ed. 664.

In the case of U. S. vs. Northway, 120 U. S. 327, 7 Sup. Ct. 580, 30 L. ed. 664, the court had under consideration the sufficiency of an indictment under the U. S. Revised Statutes, Section 5209, (Comp. St. Sec. 9772), which section is almost identical with Section 7136, Wyoming Compiled Statutes of 1920. And there the count of the indictment under consideration was for wrongfully, unlawfully and wilfully misapplying certain funds of the bank, with intent to injure the association, by paying and causing to be paid to certain persons out of certain funds then and there the property of the association a large sum of money in the purchase by him, the defendant, for the use, benefit and advantage of himself, of a large number of shares of the capital stock of certain companies. There was an allegation that the defendant at the time of the misapplication was president and agent of the bank, but there was no allegation that he misapplied the funds as president, nor that the

funds had previously come into the possession of defendant by virtue of his office. The court, in holding the count good, used this language: ''In order to misapply the funds of the bank, it is not necessary that the officer charged should be in actual possession of them by virtue of a trust committed to him. He may abstract them from the other funds of the bank unlawfully, and afterwards criminally misapply them, or by virtue of his official relation to the bank he may have such control, direction, and power of management as to direct an application of the funds in such a manner and under such circumstances as to constitute the offence of wilful misapplication. And when it is charged, as in the counts of this indictment, that he did wilfully misapply certain funds belonging to the association, by causing them to be paid out to his own use and benefit in unauthorized and unlawful purchases, without the knowledge and consent of the association, and with the intent to injure it, it necessarily implies that the acts charged were done by him in his official capacity, and by virtue of power, control, and management which he was enabled to exert by virtue of his official relation. This, we think, completes the offence intended by the statute of a wilful misapplication of the moneys and funds of a national banking association.''

In the case of Moore vs. U. S., 160 U. S. 268, 16 S. Ct. 294, 40 Law Ed. 422, cited by defendants as upholding their contention, the defendant was charged with the embezzlement of funds of a Post Office, the indictment alleging ''the said George S. Moore, being then and there an assistant clerk, or employee in or connected with the business or operations of the United States Postoffice in the city of Mobile in the State of Alabama, did embezzle the sum of................... money of the United States, of the value of..................., the said money being the personal property of the United States.'' The court says: ''Embezzlement is the fraudulent appropriation of property by a person to whom such property has been intrusted or into whose hands it has lawfully come.'' And the court holds that where an indictment

charges an embezzlement, an allegation that the property came into the defendant's hands as an officer or employee must be alleged. But the Wyoming statute makes the offense consist in any director, cashier or agent of any banking association embezzling or wilfully misapplying any of the funds of the association with intent to injure or defraud such association; and the information under consideration does not charge an embezzlement but a wilful misapplication. The information charges that defendants were directors of the bank and that they did wilfully misapply the funds of the bank with intent to injure and defraud the bank and the manner in which the misapplication was carried out is fully set forth. If defendants were directors of the bank at the time of the misapplication and while such directors did wilfully misapply the funds of the bank, we fail to see how it would add anything to the charge to state that they misapplied the funds in their official capacity. As was said in the case of U. S. v. Northway, (supra): ''Now, if in addition it be necessary to the commission of the offense of wilfully misapplying the funds of the bank, that they should have come previously into the possession of the defendant in his official capacity, so that he could be said to have been intrusted with their possession, all distinction between the offenses of wilfully misapplying the funds and of embezzlement would disappear. But it is evidently the intention of the statute not to use the word 'embezzle' and 'wilfully misapply' as synonymous.'' In that case, the court further says, as shown above, that when it is charged that defendant wilfully misapplied certain funds of the bank, ''it necessarily implies that the acts charged were done by him in his official capacity.'' In a strict sense we doubt if bank officials could misapply funds of the bank with intent to defraud the bank in their ''official capacity.'' For the felonious and fraudulent misapplication of funds would be beyond the power of officials of the bank to commit in their ''official capacity.''

The defendants cite the case of State v. Winstandley 154 Ind. 443, 57 N. E. 109. But this case was brought under a statute entirely unlike the statute under which defendants were prosecuted. The information in the Winstandley case was under a statute declaring every officer of an incorporated bank guilty of embezzlement who fraudulently receives money from a person not indebted to the bank, when the bank is insolvent, so that the money is lost to the depositor. The court held that inasmuch as the statute made the crime embezzlement, the information must follow the necessary wording of an embezzlement information by alleging that defendant received the money in his official capacity. Whether that decision would be followed by this court under a like statute, we need not decide, as we are not dealing with a transaction declared by statute to constitute embezzlement.

It is next objected that the manner in which the funds were wilfully misapplied is not sufficiently set out in the information. While it is no doubt true that an allegation merely that defendant wilfully misapplied the funds of the bank with intent to defraud would not, standing alone, be sufficient, inasmuch as the words "wilfully misapplied" have no settled meaning in criminal law as do the words "embezzle" and "steal," still we think the manner in which the wilful misapplication was accomplished is sufficiently pleaded in the information under consideration. A mere reading of the information would apprise defendants of just what they are accused of doing, so that they could adequately prepare their defense and in case of conviction plead that conviction in bar of another prosecution for the same transaction. Among the cases cited by defendants to sustain their contention that the manner in which the misapplication was accomplished is not sufficiently alleged, only two seem to us to have any bearing on the question. These are U. S. vs. Norton, (D. C.) 188 Fed. 256, and U. S. vs. Morse, (C. C.) 161 Fed. 429. The Norton case, decided by a district court, holds that an indictment is not

sufficient which charges that defendant, while an officer of a bank, with intent to injure or defraud, unlawfully and wilfully misapplied and converted to his own use, funds of the bank, by withdrawing money therefrom upon a charge ticket, pursuant to which the amount withdrawn was charged to his account; but that there must be an allegation that the defendant was insolvent and that the overdraft was not paid; also that a count alleging that the unlawful and fraudulent misapplication was accomplished by defendant by paying to himself the amount of a draft drawn by a customer on a third party to whom the bank was not indebted, is insufficient in the absence of an averment that the drawee was insolvent or of other facts showing that the draft was not collectible. If the court intended to lay down the doctrine in this decision, that a charge of wilfully misapplying the funds of a bank is not complete without allegations showing that the bank could not by any means recover the funds, or their equivalent, so wrongfully and unlawfully misapplied, then we do not hesitate to state that we are not in accord with that decision. In our opinion the crime is completed when funds of a bank are wilfully and unlawfully misapplied with intent to defraud the bank, and the fact that the bank might recover the funds so unlawfully misapplied, has nothing to do with the case. Of course, the solvency of the bank official who caused an overdraft to be paid to himself would undoubtedly be competent evidence on the part of defendant, as bearing upon the question of his intent, but that is a matter of evidence and not of pleading.

The case of U. S. v. Morse (supra) is in our opinion much better reasoned than the Norton case. That is a case decided by the Circuit Court of the Southern District of New York, and the opinion is by Judge Hough. In that case the learned Judge writing the opinion went very extensively into the decisions of the United States courts, especially the decisions of the United States Supreme Court, and sustained an indictment for wilfully misapplying funds of a

bank, which failed to allege that the overdraft payment was unauthorized by the bank directors, or that there was an actual conversion of the amount paid on the overdraft, or that the money was in some way absolutely lost to the bank. The indictment in the Morse case is very similar to the information in the case at bar. In overruling a demurrer to the indictment, Judge Hough uses this language:

"It must follow that when the indifferent facts, the acts reconcilable in themselves with either honesty or criminality, are clearly stated, a general allegation of criminal intent gives to the accused every warning he can reasonably claim, because the only question left (if the facts alleged are true) is addressed to his own consciousness, concerning which he alone has full information."

And again:

"On principle these defendants could not have possessed authority to produce or permit a conversion of the funds of the bank to Morse's use. Authority to commit a crime is an impossibility.  *  *  *  It cannot be necessary to negative a legal impossibility."

And further:

"Conversion is a technical term, and it is a fair question: Could the bank have maintained an action sounding in tort, against Morse, for this $126,000, directly it was paid out, assuming ability to prove the above-recited allegations? I think it could, and, if so, the conversion is sufficiently alleged. The fact that at some subsequent time the money was refunded would be perhaps persuasive evidence that there was no intent to defraud; but that the pecuniary loss remained actual down to the indictment must be immaterial  *  *  *  The crime was committed when the taking occurred, and no subsequent repentance or reparation can wipe that out."

We think the allegation as to wilful misapplication are sufficiently alleged in the information in question.

The next and last question raised as to the information is that it charges two offenses, inasmuch as it avers the drawing and payment of two checks. In this connection, defendants cite the case of U. S. vs. Martindale, (D. C.) 146 Fed. 280, at page 288. The court there says that where an officer of a bank is charged in an indictment with the fraudulent misapplication of its funds in the payment of several and distinct notes, each payment constitutes a separate misapplication, and must be charged in a separate count. The facts in that case do not appear from the statement. Doubtless, if separate notes are paid at different times by misapplying the bank's funds at different times, the different payments would constitute separate offenses. However, in the case at bar, it is alleged that defendant Grandbouche made two checks on the same date and delivered them to Shields at the same time, that they were presented for payment at the same time and paid at the same time from funds of the bank. Clearly it seems to us this would constitute but one misapplication of funds. The crime did not consist in the drawing and delivery of the checks, but in applying the bank's funds to their payment. The payment was but a single transaction and is so alleged and would constitute but one offense. This is too plain to require citation of authority.

We therefore hold that the information was good and that the motions and demurrer filed against it were properly overruled.

The evidence showed that the two checks were drawn and delivered in Crook County, and that they were paid by a draft drawn and delivered in Weston County by the defendant Nelson as cashier of the Citizens State Bank of Upton and that the draft was paid in Laramie County from funds of the Citizens State Bank of Upton on deposit in the Citizens National Bank of Cheyenne. The defendants claim that the crime, if any, was committed either in Crook or

Laramie County and not in Weston County. The crime alleged is the fraudulent and wilful misapplication of the funds of the Citizens State Bank of Upton in the payment of the two checks out of the bank's funds. The drawing and delivery of the two checks did not constitute the crime charged any more than buying a set of burglar tools would constitute the crime of burglary afterwards committed by the use of those tools. So, too, the crime was committed when the funds of the bank were used to pay the checks. The fact that the two checks were paid by draft rather than cash could not make any difference. The funds of the bank were misapplied when the draft was delivered. The draft was payable to the Bank of Upton and that bank accepted the draft in payments of the checks. This constituted a payment of the checks. 8 Corpus Juris, 568, 30 Cyc. 1199.

The Citizens State Bank of Upton, became absolutely liable upon the draft as soon as it was delivered. The draft was afterwards paid from funds of the Upton bank and its funds were therefore misapplied when the draft was delivered in Weston County.

It is next claimed by defendants that the evidence is not sufficient to show an intent to defraud the Citizens State Bank of Upton. We have briefly stated the evidence heretofore in this opinion and think it sufficient to say that in our opinion the jury was justified in drawing the conclusion therefrom that their verdict indicates they did draw.

Complaint is also made of the action of the trial court in overruling the motion for new trial "pro forma." All that need be said on this point is that defendants are in this court by direct appeal and not by proceedings in error. A motion for new trial was not necessary, and is not contemplated by the direct appeal statute. Their motion for new trial and order thereon, moreover, are not embodied in a bill of exceptions, as required in proceedings in error, and hence in such a proceeding could not be considered by this court. We might also add that all points raised in the motion for new trial are embodied in the specifications of error

which we are now considering and overruling; said specifications having been filed in the court below as provided by the direct appeal statute.

Lastly, it is complained that the trial court failed to charge the jury as to the law of reasonable doubt. The record shows no exceptions taken to any of the instructions given by the court and no exceptions to the refusal of the trial court to give any instructions requested by defendants, and, therefore, no error can be predicated upon the giving or refusing to give any of the instructions complained of in the specifications of error. However, we may add that we have examined the instructions given by the trial court and find that the jury was properly instructed as to the burden of proof and the law of reasonable doubt and that the case was fairly presented to the jury by the trial judge in his instructions to the jury.

Finding no error in the proceedings of the trial court, the judgment of that court will be affirmed, and it is so ordered.

*Affirmed.*

POTTER, Ch. J., and RINER, District Judge, concur.

District Judges Tidball of the Second District and Riner of the First District were called in to sit in said case instead of Justices Blume and Kimball respectively.

ON PETITION FOR REHEARING

POTTER, Chief Justice.

This case is before us at this time upon a petition for rehearing. Appellants, alleged and shown to have been directors of the Citizens State Bank of Upton, located in Weston County, in this state, were accused and convicted in the district court in that county of having wilfully and unlawfully misapplied and converted to their own use the sum of $5000 of the funds and money of said bank, with intent to injure and defraud the bank, in violation of a statute de-

claring the act so charged to be a felony and prescribing the punishment therefor. Upon appeal to this court, the judgment was affirmed. (230 Pac. 238.) A question of venue presented at the original hearing and disposed of contrary to the contention of appellants is again presented by the petition for rehearing, which specifies as the sole ground therefor that our concluison upon that question is erroneous. And it is again argued, as at the original hearing, that the alleged crime was not committed in Weston County, but, if not in Crook County, where the Grandbouche checks upon said bank were executed and delivered to the payee thereof, then in Laramie County, where the draft issued by said bank to pay the checks was paid by the drawee bank.

The facts upon which the question was and must be decided may be briefly restated as follows: For the purpose of part payment for certain stock in another bank then being purchased by defendant Grandbouche, he gave two checks for $2500 each, drawn upon said Citizens State Bank of Upton, payable to one Shields, from whom said stock was being purchased; Grandbouche's account being at the time overdrawn, a condition which continued until the closing of the bank. Said checks were deposited by Shields in a bank at Gillette, in this state, and transmitted by that bank for collection to a bank at Upton other than said Citizens State Bank, known as the ''Bank of Upton.'' Upon presentation of the checks by that bank to said Citizens Bank upon which they were drawn, the assistant cashier thereof, upon instructions from defendant Nelson, who was cashier as well as a director of said bank, issued a draft covering the amount of the two checks upon its correspondent, the Citizens National Bank of Cheyenne, in which the said Citizens Bank of Upton had an account subject to draft, and delivered the said draft to the said Bank of Upton. And that draft, sent by the collecting bank in due course of mail to the drawee bank at Cheyenne, was there paid. Other facts shown upon the trial for the purpose of establishing the

criminality of the acts. charged need not be here repeated, since the only question for our consideration now is that of venue.

Upon that question, it was said in the original opinion that the fact that the two checks were paid by draft rather than cash was not important, for the funds of the bank were misapplied when the draft, which was subsequently paid, was delivered. It is now, however, earnestly contended that no misapplication then occurred. And it is argued: That no money was then withdrawn from the bank in Weston county; that the draft, which is not mentioned in the information, was not paid by money belonging to the bank issuing it, but by the Cheyenne bank, upon which it was drawn, with money belonging to that bank, whereupon the misapplication, if any, took place only in Laramie County. It is argued also that the acceptance of the draft by the "Bank of Upton" in exchange for the checks was merely an act of clearing between the two Upton banks on that day, with nothing but the fact of the presentation of the checks and the issuance and delivery of the draft to show that the latter was accepted as a payment of the checks; and that until the draft should be and was paid, there could have been no misapplication of the money or funds of the bank issuing it.

The question as to when the acceptance of a check or draft will amount to the payment or extinguishment of an indebtedness as between the parties in the absence of a clear showing that such was their intention at the time is not, to our minds, controlling upon the point now before us. It may be conceded that had payment of the draft been refused and returned to the issuing bank as dishonored paper, the alleged misapplication of funds would not have occurred. For then the checks would have remained unpaid. But that is not the situation here. The draft *was* paid, and the amount necessarily charged against the funds or credit of the bank issuing it subject thereto in the bank upon which it was drawn. Among other cases, counsel cite the

Missouri case of State v. Mispagel, 106 S. W. 513. The charge in that case was embezzlement of money, and, stating as the well settled rule that, as in larceny, an information for embezzlement must correctly describe the property and the proof must substantially agree therewith, and that, under such rule, money means only what is legal tender, it was held, first, that the charge of the embezzlement of money would not be sustained by proof of the embezzlement of a draft or check; then, upon that ground, it was held that where the defendant, as cashier of a bank, fraudulently drew a draft upon a bank in another county, which was presented and the money collected thereon in that other county by defendant's agent, the latter thereupon causing the amount to be credited to defendant's individual account, the conversion of the money occurred in the county where the draft was paid, and that the crime was committed in that jurisdiction only.

Technical rules controlling a prosecution for embezzlement need not, we think, necessarily apply to a prosecution under our statute aforesaid for an alleged wilful misapplication of money or funds. The statute uses the word "misapply" in addition to "embezzle;" it declares it to be a felony for any director or other named officer or agent of a banking association to "embezzle, abstract or wilfully misapply any of the moneys, funds or credits of such association," with intent to injure or defraud the association, or any other company or person, etc. A distinction is thereby made between embezzlement and a wilful misapplication of funds. U. S. v. Britton, 107 U. S. 655; U. S. v. Heinze, 213 U. S. 532. It was said in the Britton case:

"The words 'wilfully misapplied' are, so far as we know, new in statutes creating offenses, and they are not used in describing any offense at common law. They have no settled technical meaning like the word 'embezzle' as used in the statutes, or the words 'steal, take and carry away,' as used at common law."

But the embezzlement case cited does not seem to be particularly in point upon the contention here that the crime was consummated in the county of the Cheyenne bank paying the draft. For that case holds the crime charged therein to have been committed where the accused cashier's checks were paid, in the county of the bank upon which they were drawn and presented for payment and thereupon paid by crediting the account of the accused with the amount thereof. And if the Grandbouche checks were paid when presented to the bank upon which they were drawn in Weston County, then, according to the view of the cited case, the district court in that county would have jurisdiction of the offense, even if the charge was embezzlement. And we remain of the opinion that for the purpose of determining the venue said checks are to be regarded as having been paid by the Upton bank when its draft was issued and delivered in exchange for them when presented for payment; that draft being subsequently paid. The evidence shows that the checks remained in the bank as cash items by direction of the cashier, but they might have been charged against the already overdrawn account of Grandbouche, and, indeed, their practical effect while retained by the bank was to evidence the obligation of Grandbouche to the bank for the amount to the same extent as if they had been charged against his account. In the Missouri case aforesaid the fact in the case at bar, that a draft was given upon another bank for the checks, was not involved.

An embezzlement case more in point here is the Kansas case of State v. Johnson, 199 Pac. 104. In that case, there had been a conviction in Butler County, Kansas, of one accused of the embezzlement of money; the charge being that the accused had embezzled money of a corporation of which he was president. It appeared that the corporation carried a deposit in its own name in a bank in El Dorado in said county; that checks upon the deposit were drawn from time to time, signed with the name of the corporation by the accused, as president, which were paid by the bank and

charged against said deposit; and that in certain instances
to which the several counts in the information corresponded,
the proceeds, or a part thereof, had been used by the ac-
cused for his own purposes. It was contended that the evi-
dence was insufficient to support the conviction because,
first, it did not show to whom the money was paid by the
bank, or that it was paid to anyone; one or more of the
checks having been made elsewhere and ultimately, upon
reaching the bank, paid by it and charged to the corpora-
tion's account. And, second, that the crime was not shown
to have been committed in Butler county. The court said
concerning the first contention:

"This was a conversion of the money of the corporation,
although no cash was at the time handed out over the coun-
ter, upon the reasoning already indicated; and it rendered
the defendant guilty of embezzlement irrespective of wheth-
er he derived any personal benefit from the transactions."

Upon the contention as to venue the court said:

"Not all of the four checks   *   *   *   were given in that
(Butler) county. One of them was given in Joplin, Mo.
*   *   *   The general rule is that the venue may be laid
in the county where the act of appropriation or conversion
took place.   *   *   *   When the defendant, wherever situ-
ated at the time, drew a check against the corporation's de-
posit in the El Dorado bank, and exchanged it for money
or property not for the benefit of the corporation, the pres-
entation of the check at the bank, through whatever hands
it had come, resulted in a reduction of the corporation's
funds there on deposit by its amount; and this may fairly
be regarded as the consummation of the offense of embezzle-
ment such as to fix its venue; the conversion being complete
when the bank makes an effective charge against the cor-
poration's account, thereby diminishing its assets that
much. This is in effect a conversion of the corporation's
money, whether the bank pays the check in cash over the

counter to the payee it names, or merely gives credit on its books to the holder from whom it receives it. In a strict technical sense, the depositor has, of course, no actual money in the bank; he has no ownership of any specific currency or specie. But in a practical sense, under ordinary conditions, in the case of a solvent bank operated as a going concern, the depositor may be regarded as owning money to the amount of his deposit, and an agent who has a right to check upon it for his principal's benefit, and wrongfully does so for his own advantage, embezzles the amount of money represented, although the check itself may have left his hands before being presented for payment.''

That case, we think, is clearly in line with our view that the conversion in this case and the resulting misapplication of the funds of the Upton bank occurred when the Grandbouche checks were accepted in exchange for the draft. At that moment the bank's assets were diminished by the amount of the draft, and, to the extent of the amount of the checks included in the draft, were misapplied. A conclusion similar to that in the Kansas case, though the question of venue does not seem to have been involved, was stated in a prosecution of a state treasurer for the embezzlement of public funds (Bartley v. State, 53 Nebr, 310, 73 N. W. 744), in which is to be found an exhaustive and instructive discussion, with the citation of numerous authorities. We quote the following extracts from the opinion in that case, which was later approved in a rehearing opinion (55 Nebr. 294)..

''The state, at the time of the delivery of the check in question to the bank, had on deposit therein, under the depository law, money in excess of the amount found by the jury to have been embezzled, which constituted the bank the debtor of the state to that amount. * * * To constitute embezzlement, it was not necessary that the defendant himself should have acquired the visible or manual possession of the money. He, by his check, authorized and di-

rected the bank to pay the money called for therein.
*  *  *  The bank was thereby empowered to select and
transfer the money to the payee, which in contemplation of
law it did, although there was no actual handling of a dol-
lar in the entire transaction.''

In the rehearing opinion the court described the trans-
action as follows:

"The several acts and matters elemental, directly or in-
directly, of the purposed conversion of the state's money
were but means to the end and had reached their final ac-
complishment when, pursuant to the order of the check,
the moneys of the state were paid out or transferred, not
for its use or uses, but to perfect, to close and render en-
tirely effectual the misappropriation of the money to the
use or uses of the plaintiff in error.  *  *  *  It is true
there was no physical transfer of cash—money in specie—
but the mental processes were all fully existent and active,
and were, through regular recognized methods of business
procedure, carried out, and the money taken for the in-
dividual benefit, and not for the state.''

In a case referred to in the original opinion in Bartley v.
State, as precisely in point, State v. Krug, 12 Wash. 288, a
prosecution for the embezzlement of moneys by a city treas-
urer, the evidence was said to have disclosed that the de-
fendant, as treasurer, drew a check for $10,000 in favor of
another upon a bank having city funds on deposit in excess
of that amount; that the payee presented the check and re-
ceived in payment thereof New York exchange, the bank
thereupon charging the amount in its books to the city, there-
by lessening its credit to that extent.  The jury were in-
structed that the transaction constituted a payment of
money, and that they should construe the treasurer's check
merely as the instrumentality by which the money of the
city was transferred from the defendant's possession.  The
Supreme Court sustained that instruction, saying:

"This instruction of the court is based upon the theory that, in contemplation of law at least, this was money. * * * The practical result of the transaction was that, when this check was given * * * and was paid * * * by the New York exchange, and that amount charged to the account of the city, * * * it was just as much a disposition of that $10,000 by the treasurer as though he had gone to the bank and got the money himself, and paid it ''to the payee of the check,'' or had loaned him that amount of money * * *.''

That seems also to be directly in point in this case, supporting our view that upon the issuance of the draft in exchange for the checks, the funds of the bank were then misapplied, whether the checks were retained as cash items or charged or to be considered as chargeable against the Grandbouche account in the bank.

Counsel for appellant have called our attention also to the case of Bates v. State, 124 Wis. 612, 103 N. W. 251, where it was decided that an information charging the obtaining of a stated sum of money and property by means of false pretenses charged only the obtaining of money, that the crime would not be established by proof of obtaining merely evidences of money, and, therefore, that where a draft, obtained by false pretenses in Wisconsin, was paid in Iowa, the crime charged was committed in the latter state and not in Wisconsin. But a case more in point here is State v. Smith, 162 Ia. 336, 144 N. W. 32. A defendant was there charged with obtaining money by false pretenses, and it appeared that the person defrauded through false representations contained in a letter sent to him in Nebraska from Polk County, Iowa, drew his check on a bank situated in Cass County, Iowa, mailing it to the accused in said Polk County, whereupon the accused presented it to the bank in that county, and his account in the bank was credited therewith and the money afterwards checked out; the said bank thereafter receiving the money through the

clearing house in the city, and the check being finally paid by the bank in Cass County, upon which it was drawn. Upon those facts it was held that the offense was committed in Polk County, where the check had been presented by the accused and his account credited therewith, giving the court in that county jurisdiction. It is stated in the opinion that the point most strongly contended for by the appellant was that the defendant should be held to answer, if at all, in Cass County, where the check was ultimately paid by the bank upon which it was drawn. The contention thus stated seems to approximate the contention of counsel here, that the venue is to be determined by the fact of the payment of the draft in Laramie county. The Iowa court said, disposing of the contention:

"Defendant did actually receive the money from the Des Moines bank (in Polk County) and that moment Thorley (the maker) was bound to pay it. Defendant having actually received the money in Polk County, it seems to us it would be technical to say he did not receive it there. It was his purpose to get the money, and when he got it, Thorley was defrauded."

And the court said further that the fact that defendant would have been liable to the Des Moines bank in case Thorley had no funds in the Cass County bank to meet the check was not material, citing Burton v. U. S., 196 U. S. 283, 25 Sup. Ct. 243, 49 L. Ed. 482.

The Burton case above cited is also opposed to the contention in this case. Burton, a United States Senator, was indicted, tried and convicted in St. Louis, Mo., for, as alleged, receiving there a stated sum of money as compensation for services rendered before the Postoffice Department in a matter wherein the United States was directly interested, in violation of section 5480 of the Revised Statutes of the United States. It was shown upon the trial that the money was received in the form of checks, each of them having been received by the defendant in the city of Washing-

ton, and by him there endorsed and deposited with the Riggs National Bank, and that afterwards they were duly paid by the Commonwealth Trust Company at St. Louis, upon which institution they had been drawn; that the amount was in each instance immediately credited by the Riggs National Bank to the account of the defendant with that bank. The court said also that there was no oral or special agreement made between the defendant and the bank at the time when any one of the checks was deposited and credit given for the amount thereof. The Federal District court had charged the jury with reference to the legal effect of the transaction of the deposit of the checks with the bank at Washington substantially as follows: That if it was the intent and understanding of said bank and the accused that the bank should forward the checks in the usual course to St. Louis for payment, and that in doing so, it should act only as the agent of the accused for that purpose, then the final payment at St. Louis would amount in law to a payment at that place of the amount of the check to the accused. But if, on the contrary, it was the understanding and intent that the bank should become the purchaser and owner of the checks, then the payment at St. Louis would amount in law to a payment to the Washington bank and not to the accused, in which event no crime would have been committed by the accused in St. Louis.

The Supreme Court held that the question of venue should not have been submitted to the jury, but that the transaction between the Washington bank and the accused was to be understood as an ordinary case of the transfer or sale of the check by the defendant and its purchase by the bank, and that upon its delivery to the bank, the title thereof passed to it, so that it was not thereafter in any sense the agent of the defendant for the purpose of collecting the amount. The case was reversed, partly upon the ground of lack of jurisdiction by the court in the district where it was tried. The point in the case material here is that the money was held to have been received at Washington and

not at St. Louis, where the check was payable and ultimately paid. The court in its discussion conceded that the defendant would be liable to the Washington bank upon his endorsement of the check, but did not regard that as a matter controlling the question of venue, but said, notwithstanding that liability, that the money was received at Washington.

The determinative question there was,—where was the money received; for the charge was and the statute prohibited the *receiving* of compensation. Here the question is the misapplication of money or funds. The bank in Weston County had left in its possession, upon delivery of its draft, the Grandbouche checks of no apparent value, and, indeed, of no value, as we think the evidence disclosed. There were no funds to the maker's credit to pay them, nor sufficient cash on hand in the bank to pay them, and it seems to us that it would be quite unreasonable to hold that the money or funds of the bank were *not then and at that place* misapplied, within the meaning of the statute. It has been expressly held that where the president of a bank, by reason of his official position with it, embezzles its funds by drawing them by checks issued in another county, the venue of the crime is not improperly laid in the county in which the bank is situated. Weathers v. State, 24 Ga. App. 363, 100 S. E. 768. And to the same effect is the earlier case decided by the same court. Mangham v. State, 11 Ga. App. 427, 75 S. E. 512.

It is said in Lear v. U. S., 147 Fed. 349, that the word "misapply" does not necessarily mean that the officer in charge should have physical possession of the funds misapplied. The misapplication in that case was alleged to have occurred as follows: That the said accused, president of a named bank, did pay and cause to be paid to himself upon and pursuant to the direction and authority contained in a certain draft of the said banking association drawn upon a stated bank in Philadelphia to the order of the bank of which the accused was president, and from and out of

the means, funds and credits of the latter. And the court said that the transaction "was a handing over of the bank's funds, by the cashier, on the demand of his superior officer, whom he knew at that time to be indebted to the bank, in a stated sum, part of which were overdrafts." That is to say, as we understand, that the issuing of the draft by the cashier upon the direction of the accused as president then and there amounted to a handing over of the funds of the bank to the amount of the draft.

We have not at any time entertained a doubt as to the question here considered, or that it was correctly decided as stated in the original opinion, but we have given careful consideration to the able brief in support of the application for rehearing and have made a further examination of the question, as herein disclosed. We feel satisfied that a rehearing could not result in a different conclusion, and are constrained to deny the application therefor.

*Rehearing Denied.*

TIDBALL, District Judge, and RINER, District Judge (sitting in place of Justices Blume and Kimball), concur.