[Crim. No. 2667. First Dist., Div. One. Oct. 16, 1950.]

THE PEOPLE, Respondent, v. VERNON LeROY HOWES, Appellant.

I. B. Padway and John R. Golden for Appellant.

Fred N. Howser, Attorney General, David K. Lener, Deputy Attorney General, and June D. Borina, District Attorney, for Respondent.

PETERS, P. J.—Appellant, Vernon LeRoy Howes, was found guilty of grand theft. From the judgment of conviction and from the order denying his motion for a new trial this appeal is prosecuted. Appellant contends that the information was insufficient, that the evidence, at most, shows a series of petty thefts and not grand theft, and that prejudicial error was committed by the trial court in its rulings, instructions and comments. There is no merit in any of these contentions.

## FACTS

Crowley and Traulsen, a partnership, operate a general garage business in Watsonville. The garage operated a tire department which was the exclusive distributor of Firestone tires in the area. For three years prior to July of 1949, when his employment was terminated, appellant had been employed in the tire department of the garage, and for a year prior to that date had been in charge of that department. As head of that department he was responsible for the purchase and sale of all tires by the garage. He spent part of his working hours in the country soliciting business and making deliveries, and part of his time at the garage. He was paid for his services on an hourly basis, and also was promised by the partners a commission, but whether on net or gross profits is in dispute. Admittedly, no commissions were ever paid, and this fact was a source of friction between the parties.

The books of the garage were kept by a bookkeeper employed by the partnership. The accounts receivable ledgers showed accounts in the names of James Cantrell, Byers Garage, Charles Manfre, Richard Barnes, Tony Simas and Lloyd Mitchell. The evidence shows that appellant sold to the company and persons above mentioned, and to others, tires belonging to his employers, and pocketed the proceeds. In practically each case he represented to the persons he dealt with that he was engaged in business for himself as well as for his employer, and that the tires, which he sold for less than the usual price, were his tires.

The *modus operandi* of appellant can best be explained by a reference to the testimony of some of the witnesses. Can-

trell testified that he operated a fleet of trucks in his produce and hay business; that he bought tires from appellant because he could get them cheaper than elsewhere; that when he first dealt with appellant he did not know that appellant was employed by Crowley and Traulsen; that appellant told him that he was buying tires in Salinas and Los Angeles and selling them for himself; that he made several purchases from appellant; that he paid appellant by checks made out to appellant or to cash; that the checks were for $88.65, $77 and $54; that a couple of months after he had paid for the tires he received a bill from the garage for the same tires; that he immediately went to the garage and talked to appellant who told him: "Don't worry about it, it is just a mistake; it will be all fixed up, cleared up"; that this occurred in June or July of 1949; that during the next month he made another purchase from appellant, and, at the end of that month, received another statement from the garage billing him for all of the tires he had purchased; that he did not know that these tires belonged to the garage.

Byers testified that he operates a garage; that in June or early in July, 1949, he bought two tires from appellant, giving appellant $56.64 in cash; that several weeks later he received a bill from the garage for $476.16, which billed him for the tires he had purchased and for many others that he had not purchased or ordered; that he asked appellant what the bill meant, and was told "it was just more or less routine"; that at his request appellant wrote on the bill "paid Roy."

Mitchell testified that he operates a tire shop; that in September, 1949, he was billed by the garage for $279.71; that included in the bill was a charge of $158.40 for tires and tubes which he had neither ordered nor received; that the spurious charge was on an invoice dated July 26, 1949; that he telephoned to the office girl at the garage and did not pay the $158.40.

Golarte is a truck driver and lettuce loader. He testified that in May, 1949, appellant brought three tires to his home and asked him to deliver them to one Manfre who had purchased them, and to collect $120 from Manfre; that he delivered the tires to Manfre who gave him a check made out to cash for $120; that upon appellant's direction, and in his presence, he cashed the check at a bar and appellant picked up and pocketed the money; that appellant then bought him a

drink and left some money at the bar for Golarte to purchase drinks.

Manfre testified that a day or two before Golarte delivered the three tires he had discussed the purchase of tires with appellant; that appellant told him that Golarte had three tires for sale; that when Golarte delivered the tires he believed that the tires belonged to Golarte, and gave him the $120 check.

Simas testified that he made several purchases of tires from appellant and paid for them by checks made out to cash and delivered to appellant, or by checks made out to his employee Pini, who endorsed them to appellant; that he was billed by the garage for $102.23; that after appellant was arrested he discussed this bill with appellant; that appellant gave him a check for $100 on the morning of his preliminary examination; that the witness then called the police in appellant's presence and told them that appellant had paid him and that he was going to take the check to the garage; that the check was not honored by the bank on which it was drawn, appellant having no account there; that he thought appellant owned and operated the tire shop in the garage, and that the garage allowed him to use their billheads.

Pini, an employee of Simas, testified that he bought tires from appellant at the garage and paid for them with checks made out by Simas to himself or to appellant; that one check was for $25, and another for $30.

Barnes, who lived in Hollister and was a general trucker, testified that he purchased six tires from appellant at the garage; that for these he gave appellant two checks payable to cash, one for $112.47 and one for $100, and another check payable to appellant for $162; that later he was billed for these tires by the garage; that the tires were all Firestones and delivery was made in Pajaro.

The Salinas store manager for the Firestone Company, one Fagan by name, was shown a statement on Crowley and Traulsen's billhead dated May 27, 1949, which indicated that the Salinas store had borrowed twelve truck tires from appellant's garage, and testified that the cost of such tires would have been over $900; that he had never received the tires and had never heard of the merchandise invoiced therein; that appellant had never personally bought tires from the Salinas store.

The garage bookkeeper testified that most of the sales tags for the tire department of the garage were made out by appel-

lant, and she identified many such tags as being in the handwriting of appellant. These were the tags that were used as the basis for sending bills to Cantrell and the others.

Crowley, one of the partners, testified that after he discovered that Manfre had three Firestone tires he checked the inventory and found no shortages, because entries had been made to cover up the shortages.

Jacobson, a Watsonville police officer, talked to appellant on July 29, 1949, in the police station. He testified that he confronted appellant with certain canceled checks and asked him to explain them; that appellant stated that he was selling tires on his own, that is, that he would sell "on the side to somebody, make a couple of dollars on it, then I would replace the tires in stock"; that he would keep the inventory straight by buying tires from brokers and thus replace those he had taken; that appellant, at that time, signed a statement, which, in part, stated: "About six months ago I started to sell some new tires at a small margin of profit. I used the money to replace the tires and kept the profit I made on the sale. As near as I can remember, I made about 30 sales in this period of time which netted me approximately $200. I'm sure it was not over this amount. This is all I ever took from the garage."

Another Watsonville police officer, Dicks by name, testified that on August 5, 1949, appellant was rearrested when it appeared that the shortage was greater than at first thought, and at that time appellant made to him substantially the same statements made to Jacobson.

Appellant took the stand in his own defense and told a story that was contradicted by other witnesses in almost every respect. He testified that after the garage failed to give him a commission on tire sales, he started to buy and sell tires on his own account. Some of these tires, he said, he purchased for cash at the Salinas Firestore store, that store billing them to a Salinas service station. Fagan, the Salinas manager, positively denied this. Appellant also said that some of the tires were purchased from the Firestone San Jose store. This was denied by the operators of that store. Appellant denied ever selling tires belonging to the garage. He purported to explain the Golarte-Manfre transaction by testifying that the tires belonged to Golarte and that he, the appellant, merely told Manfre about Golarte. He denied making one cent on the transaction. This story was directly denied by

Golarte. Some of the checks cashed by him he identified as being given to him for tires which he had sold personally to Simas and Cantrell. He admitted making out the memorandum slip indicating that the Salinas store had taken twelve tires. This was denied. He denied receiving any money from Byers, claiming that Byers had dealt with the garage. He denied writing "paid Roy" on Byers' bill. He wrote "Paid in full, Roy" nine times on a sheet of paper. He explained his admissions to the police officers as being simply admissions that he was selling tires for himself, and that his statement that he owed the garage $200 merely meant that was the profit he made on the private sales, and the police officers had told him such profits belonged to the garage. He testified that the Salinas tire purchases were made from Fagan or from Rawley, and the San Jose purchases from Leo Cain or his successor.

O. E. Heinrich, as a handwriting expert, testified that the words "paid Roy" were written by appellant. Also in rebuttal, Ehlert, who runs the retread shop for Firestone in San Jose, and who succeeded Leo Cain, testified that appellant had never been in his San Jose store between January 1st and August 1, 1949; that on August 1, 1949, appellant tried to buy some recapped tires from him, and he told appellant that his store only processed tires and did not sell them or handle money; that appellant asked him to sign a statement certifying that appellant had purchased tires from the retread shop, but he refused to do so; that his shop would pick up, process and return tires to Crowley and Traulsen; that the records of his store show that appellant purchased no tires from that store between January 1st and August 1, 1949. Leo Cain, predecessor of Ehlert, testified that he had had no dealings with appellant personally, and positively denied selling any tires to appellant.

Alston, in charge of the retread shop for Firestone in Salinas, testified that he and Fagan picked up and delivered retreads to Crowley and Traulsen's during the period here involved, and that he had never sold any tires to appellant; that between August 15th and September 1, 1949, appellant asked him to sign a statement that he had sold appellant new tires; that he refused to sign the statement because it was not true; that appellant asked him to get the store manager to sign it; that the witness left the paper on the desk of the manager who was then on vacation; that he knew nothing about the twelve tires charged to the Salinas store;

that he had never received them. Fagan likewise denied receiving the tires, and testified that his records showed no such transaction. He denied ever selling tires to appellant personally, and denied that he had covered up such sales by charging the transaction to service stations.

The jury, after 15 minutes deliberation, found appellant guilty of grand theft as charged.

The first contention of appellant is that the amended information is fatally defective. The amended information accuses appellant of a felony, namely: "Violation of Section 487 of the Penal Code of the State of California in that on, or about and between the 14th day of May, 1949, and July 26, 1949 in the City of Watsonville, County of Santa Cruz, State of California, said defendant did wilfully, unlawfully and feloniously take more than $200.00, in money, lawful money of the United States, and of the personal property of Crowley & Traulsen." It is the thought of appellant that such an information is defective because the exact amount of the defalcation is not stated, nor is the precise date of the misappropriation or misappropriations set forth. He also argues that, since the offense is charged as having occurred between May 14, 1949, and July 26, 1949, it cannot be ascertained whether one theft of "more than" $200 occurred, or a series of thefts totalling "more than" $200 is charged, and that if less than $200 was taken each day, even though the total exceeded $200, he would be guilty of only a series of petty thefts and not of grand theft. It seems to be the thought of appellant that when an information is based on a series of thefts, although but one offense is charged, the date and amount of each theft must be specifically alleged. Undoubtedly, prior to the 1927 amendments to section 952 of the Penal Code (Stats 1927, chap. 612, p. 1043), the contention of appellant would have been sound. The case of *People* v. *Barnard,* 63 Cal.App. 562 [219 P. 756], cited by him, and others that could be cited, so held. But many of the old technical rules of pleading in criminal cases, including the rule contended for, were eliminated by the 1927 amendment, and since that time the Barnard case has been specifically overruled. In *People* v. *Chait,* 69 Cal.App.2d 503, 512 [159 P.2d 445], the court directly held that the Barnard case was no longer the law because it "was decided before the Legislature in 1927 amended the Penal Code to eliminate many of the frivolous technicalities found in the decisions relating to criminal procedure."

After discussing the 1927 amendment the court stated that the present rule is that (p. 513) ''the indictment is to be tested in the view of section 952 of the Penal Code—whether it is sufficient to give the accused notice of the offense of the offense.' '' ■ The rule is now well settled that· an which he is charged. . . . [U]nder that section it is sufficient to charge the accused 'in the words of the enactment describing indictment or information is sufficient if it follows the wording of the statute defining the offense. ■ It is also the law that even a defective information or indictment will not result in a reversal unless a substantial right of the defendant on the merits is adversely affected. (Pen. Code, § 960; *People v. Codina,* 30 Cal.2d 356, 359 [181 P.2d 881]; *People v. Schoeller,* 96 Cal.App.2d 61, 63 [214 P.2d 565]; *People v. Macias,* 77 Cal.App.2d 71, 78 [174 P.2d 895]; *People v. Benenato,* 77 Cal.App.2d 350, 362 [175 P.2d 296]; *People v. Gelardi,* 77 Cal.App.2d 467, 472 [175 P.2d 855]; *People v. Israel,* 91 Cal.App.2d 773, 778 [206 P.2d 62]; *People v. Tullos,* 57 Cal.App.2d 233, 238 [134 P.2d 280].) Tested by these standards, the amended information properly charges grand theft.

Appellant does not seriously attack the sufficiency of the evidence to show that he committed a series of crimes, but contends that the evidence shows that he stole tires and not money, and that, at most, the evidence shows a series of petty thefts and no single theft of over $200 as required by section 487 of the Penal Code to constitute grand theft.

■ It is the contention of appellant that because he was charged with taking money and not with stealing the tires, it must have been the theory of the prosecution that appellant was lawfully in possession of the tires, but stole the proceeds received on the various sales, and thus committed embezzlement and not larceny. But in either event, so he claims, there were only a series of petty thefts each of less than $200. A proper analysis of the facts and the law demonstrates that these arguments are unsound. Whether or not appellant was in lawful possession of the particular tires is a difficult question to answer, but whether he was or not he was guilty of the theft of money, although he may also have been guilty of the theft of the tires. It could be argued that, although appellant was in charge of the tire department, and therefore in lawful possession of the tires as agent of the garage, he did not sell the tires as agent and such sales were not made of tires entrusted to him for the purpose of selling them for the

garage, but were sales of tires he claimed to own on his own account. Thus, the case is not necessarily one where the trusted agent sells his principal's property and unlawfully pockets the proceeds, but may be one where appellant, intending to sell the tires for himself and to keep the proceeds, took the tires, sold them for a cheap price, and pocketed the proceeds. Thus, after he took the tires with such intent he was not in lawful possession of them, and when he took the money he had a felonious intent. This would constitute larceny and not embezzlement. (See discussion 10 Cal.Jur. p. 240, § 4.) There can be no doubt that the evidence shows that at the very time he received the money from the purchasers, appellant intended to keep it. The cash paid was paid to and kept by him; some of the checks were made to him or to cash, and cashed by him, and the proceeds retained. All of the evidence indicates that from the time appellant first approached the purchasers he intended to keep the proceeds of such sales for himself. Thus, since the felonious intent existed at the very time the money was taken, the crime is grand theft by larceny and not grand theft by embezzlement.

But, says appellant, such argument proves that he stole tires and not money, and therefore his conviction of stealing money cannot stand. While the evidence may show a theft of the tires, it also shows a theft of the money. A thief does not become the owner of the property that he steals. He gets no title to it, and can pass no title to it. But when he sells stolen property, the owner of the property may impose a constructive trust on the proceeds. Why? Because the proceeds belong to the owner of the property. Where the thief disposes of the proceeds for his own benefit, he has stolen money of the owner of the property. These principles are well settled. (See discussion 3 Scott on Trusts, §§ 508, 508.1 and 508.2, pp. 2432-2438; 3 Bogert on Trusts and Trustees (pt. 1), § 476, p. 31; see, also, *Brodie* v. *Barnes*, 56 Cal.App.2d 315, 322 [132 P.2d 595].) Thus, the argument that the evidence may show a theft of the tires, even if sound, does not demonstrate that the evidence does not show a theft of the money. A theft of money was clearly shown by the evidence, and whether the evidence also shows a theft of the tires is a false factor.

But, argues appellant, the evidence demonstrates that although the total value of the tires and the total value of the proceeds of the sales of such tires far exceeded $200, each

sale was made to a separate purchaser, and each sale was for less than $200. Based on this premise, which is in accordance with the evidence, appellant claims that he is guilty only of a series of petty thefts and not of grand theft.

This raises a somewhat difficult problem. There are many cases discussing the problem of whether a series of thefts constitute one offense or a series of offenses, and they are not all consistent. The following general rules, however, would seem to be established:

1. Where the theft is accomplished by means of false representations, each receipt of money or property is usually held to constitute a separate offense, although the false representations were made but once. (*People* v. *Ellison*, 26 Cal. App.2d 496 [79 P.2d 732] ; *People* v. *Miles*, 37 Cal.App.2d 373 [99 P.2d 551] ; *People* v. *Rabe*, 202 Cal. 409 [261 P. 303] ; *People* v. *Coyle*, 134 Cal.App. 612 [25 P.2d 991] ; *People* v. *Serna*, 43 Cal.App.2d 106 [110 P.2d 492].)

2. In larceny cases, where there are several deliveries by the thief to the seller of stolen goods, all part of the same general transaction, it has been held that there is but one offense. (*People* v. *Dillon*, 1 Cal.App.2d 224 [36 P.2d 416] ; *People* v. *Sing*, 42 Cal.App. 385 [183 P. 865].) Likewise, a series of thefts from the same employer by an employee, all part of a general plan, constitutes but one offense. (*People* v. *Yachimowicz*, 57 Cal.App.2d 375 [134 P.2d 271].)

3. Theft by way of embezzlement has given rise to some difficulties. It has been held that a series of embezzlements from the same owner constitutes separate offenses. (*People* v. *McCann*, 96 Cal.App. 664 [274 P. 621] ; *People* v. *Hatch*, 13 Cal.App. 521 [109 P. 1097] ; *People* v. *Bartnett*, 15 Cal.App. 89 [113 P. 879] ; *People* v. *Stanford*, 16 Cal.2d 247 [105 P.2d 969].) But it has been held also that where the defrauded person makes a series of payments to the embezzler in connection with the same transaction, each payment is not a separate offense, and there is but one offense. (*People* v. *Bratton*, 125 Cal.App. 337 [14 P.2d 125] ; *People* v. *Fleming*, 220 Cal. 601 [32 P.2d 593].)

From these cases, and others that could be cited, it can be said that the general test as to whether there are separate offenses or one offense is whether the evidence discloses one general intent or discloses separate and distinct intents. The particular facts and circumstances of each case determine this question. If there is but one intention, one general impulse, and one plan, even though there is a series of transactions,

there is but one offense, and this is so whether the theft is accomplished by larceny or embezzlement.

Appellant, in his attempt to demonstrate that here there were separate offenses, places his main reliance on *People* v. *Stanford*, 16 Cal.2d 247 [105 P.2d 969]. In that case an attorney embezzled trust funds belonging to his client. He was indicted on three counts, the first charging that he took $500 from the fund on a certain day; the second that he later took the balance of the fund amounting to over $7,000; and the third, that still later he took over $2,000 that subsequently came into the trust fund. It was held that the defendant's conviction on the three counts of embezzlement should be affirmed. In reaching this result the court (p. 251) stated:

". . . The question of whether a series of wrongful acts constitutes a single or multiple offense must in the last analysis be determined by the peculiar facts and circumstances of each individual case. In the present case the evidence showed that the thefts referred to in the first three counts of the indictment were separate and distinct transactions, which occurred on different dates, and involved the taking of different sums of money. Such separate transactions constituted separate offenses. [Citing cases.]

"While transactions in series have frequently been held to constitute but parts of one continuous proceeding, and hence but one offense, this result is more commonly reached in cases of larceny than in those of embezzlement. This follows from the fact that in the crime of larceny the defendant has obtained possession of his victim's property by wrongful means, and completion of the offense is not dependent upon whether he thereafter appropriates the fruits of his theft by a single act or at successive intervals. On the other hand, in the case of an embezzlement, the property is already in the rightful possession of the defendant, and his subsequent fraudulent appropriation is of the essence of the crime. (Pen. Code, sec. 503.) Thus in each of the cases relied upon by appellant [citing such cases], the particular facts and circumstances showed that the exact time of completion of the misappropriation was not controlling and for this reason the court was justified in concluding that the several transactions involved constituted one offense. In the present case, the evidence, as already stated, established clearly the commission of separate offenses by distinct appropriations of different sums of money on separate occasions."

■ As already pointed out, the present crime is grand theft committed by way of larceny and not by way of embezzlement. The case mainly relied upon by the People to show that here there was but one offense, and the case which, in our opinion, is controlling, is *People* v. *Yachimowicz,* 57 Cal. App.2d 375 [134 P.2d 271]. There, as here, the defendant was convicted of grand theft. He had been demoted by his employer, who operated a hardware store, and felt that he had been unfairly treated. In the instant case the appellant felt that he had been unfairly treated because the partners failed to pay him the commission he contended had been promised. It is a reasonable inference from the evidence that appellant was motivated in stealing the money by this grudge in reference to the commissions. In the Yachimowicz case the defendant had been demoted to night watchman. He drove his automobile to work and loaded it with store equipment which he transported to his home. When finally apprehended, he had removed company property, over a considerable length of time, and, of course, on many different occasions, of the total value of $15,000. The information charged him with the theft of five guns of the total value of over $200, but failed to disclose whether the guns were all taken at once or taken on separate days. In reference to this problem the court stated (p. 381): ''On the point that the evidence in the case is insufficient to sustain the judgment of conviction, it appears that the only matter warranting comment relates to the value of the property which the appellant was convicted of stealing. He argues that if each gun were taken on a separate day there would be no grand theft under any theory known to the law. It must be conceded that there was no direct evidence that all five guns, of the value of more than $200, were taken by the appellant at the same time, nor was there any direct evidence that they were taken one by one at different times. However, it is apparent that the entire plan of stealing resorted to by appellant was in furtherance of his design to secure personal and monetary satisfaction for his treatment at the hands of his employers. Upon the evidence received by the trial court and under the reasoning of *People* v. *Sing* (1919), 42 Cal.App. 385 [183 P. 865], we feel that the defendant was justly convicted of the crime of grand theft. We quote from the language in that opinion, at page 396, as follows: 'The law is that if different asportations from the same owner are prompted by one design, one purpose, one impulse, they are a single act, without regard to time.' '' (See, also, *People* v.

*Dillon,* 1 Cal.App.2d 224, 229 [36 P.2d 416] ; *People* v. *Fleming,* 220 Cal. 601, 611 [32 P.2d 593].)

In the instant case, it is our opinion that the evidence shows that the various acts of appellant were all motivated, generally, "by one design, one purpose, [and] one impulse," i.e.—the grievance against the partners for failure to pay him the commissions which he contended had been promised. Thus, as in the Yachimowicz case, the appellant was pursuing a general plan of taking property from his employer who he felt had mistreated him. There was one general impulse, and one general plan that motivated all of the challenged acts. There was but one general intent, and therefore, but one offense.

▆ Appellant objects to certain rulings, comments and instructions of the court. One such objection is that the trial court committed error in its rulings in reference to the amount of the claimed shortage. No inventory was produced. Crowley, one of the partners, testified as a prosecution witness. On cross-examination the defense was apparently trying to show that the garage books were kept in a slipshod manner. Crowley was asked if an inventory had not been taken just before appellant assumed control of the tire department. He replied that such had been done. Then Crowley was asked if appellant had not shown him a $1,500 error in the inventory. He responded that he could recall no such conversation. On redirect he testified that an inventory had been taken before appellant took over the tire shop, and another after the employment of appellant had terminated. As to this last inventory, which he had not taken personally, he testified that it was short $2,500. It took three or four questions to develop this answer, and no objection was made to any of these questions. After the answer had been given, appellant objected on the ground that "this witness not being competent to testify"—apparently because he had not taken the inventory himself. The trial court overruled the objection because it was made too late—after the answer was in.

▆ ▆ Under later cross-examination, Crowley testified that Manfre telephoned him and told him that he had three Firestone tires, whereupon the witness conferred with appellant to see if any tires were missing. No missing tires were found so far as the inventory was concerned, but the witness stated that entries had been made to cover up the shortage. On redirect the prosecution asked the witness if the reason

why no shortage was discovered was because he gave credit to appellant for sales and deliveries that had not been made. The witness answered that such was the fact, whereupon appellant's counsel objected that the question was leading. The court then stated: "The question has been asked and answered. . . . You are supposed to speak up loudly; you can hear what is being said, unless you need one of those Sonotones like one of the members of the jury. . . ." A colloquy ensued and the court apologized for its facetious remark and specifically stated that it had meant no criticism of appellant's counsel. It is quite clear that, even if the objection were timely and should have been sustained to this line of questioning, which is doubtful, the error could not have been prejudicial inasmuch as appellant's counsel had opened the subject on cross-examination and examined the witness at some length. The heavy humor of the court was out of place, but the timely admonition rendered this error nonprejudicial.

After these occurrences a very confused colloquy took place between appellant's counsel, the court and the witness Crowley. Apparently appellant's counsel was trying to extract from Crowley an explanation favorable to his client of the claimed shortages. It is apparent that all concerned were confused between a $400 shortage in another department and the claimed $2,500 shortage in the tire department during the time appellant was in charge. Appellant's counsel kept asking about the $400 shortage, and the court properly refused to permit the interrogation because it involved a collateral issue. The confusion that obviously existed was largely caused by appellant's counsel. If he desired to pursue this inquiry, he should have more clearly indicated the subject matter involved.

Appellant also objects to the refusal of the court to permit the defense to impeach the prosecution witness Ehlert. This witness operated the Firestone retread shop in San Jose. He testified on direct that his retread shop did no cash business at all. On cross-examination the defense sought to introduce a bill made out to a particular company in order to show that the store did occasionally sell for cash. The trial court sustained an objection to the introduction of this bill on general grounds and on the specific ground that the offered bill was dated August 22, 1949, and was therefore outside the time covered by the information. It would appear that the transaction involved a collateral matter upon which the witness could not be impeached. (*People* v. *McDaniel*, 59 Cal.

App.2d 672 [140 P.2d 88] ; *People* v. *Pollock*, 31 Cal.App.2d 747 [89 P.2d 128].) Moreover, later the court did admit the exhibit for the limited purpose of rebutting the testimony that the Firestone Company did not sell at wholesale to any company other than to a Firestone dealer.

 Objection is made to the limitation placed by the court on the recross-examination of the prosecution witness Wright. An examination of the record discloses that the questions asked had already been discussed at length on cross-examination. It was not error to refuse to permit further interrogation on the point.

Appellant makes several technical objections to several of the instructions, and to many of the comments of the court. We have examined each such assignment and find that no instruction was erroneous, far less prejudicial. The jury was fairly and correctly instructed. As to the challenged comments, appellant's main objection seems to be that the trial judge was unnecessarily curt, sarcastic and impatient with counsel for appellant, and that, while no one incident ·alone would cause a reversal, the cumulative effect was to prejudice appellant's defense. It would unduly prolong this already lengthy opinion to consider these numerous assignments in detail. We have read the record. We think that the evidence overwhelmingly demonstrates appellant's guilt. While the trial judge was occasionally unnecessarily curt and sarcastic, and while some of his rulings were unduly strict against appellant, the record demonstrates, on the whole, that appellant had a fair trial. Certainly the record demonstrates that appellant's conviction has not resulted in a miscarriage of justice. No prejudicial error occurred.

The judgment and order appealed from are affirmed.

Bray, J., and Wood (Fred B.), J., concurred.