Joseph Steven **TORTOLITO**, Appellant (Defendant),

v.

The **STATE** of Wyoming, Appellee (Plaintiff).

No. 92–237.

Supreme Court of Wyoming.

Nov. 23, 1994.

Rehearing Granted Jan. 6, 1995.

865

Wyoming Public Defender Program: Leonard D. Munker, State Public Defender; Deb Cornia, Appellate Counsel, Wyoming Public Defender Program; and Tim Newcomb of Grant & Newcomb, Cheyenne, for appellant.

Joseph B. Meyer, Atty. Gen.; Sylvia Lee Hackl, Deputy Atty. Gen.; Barbara L. Boyer, Sr. Asst. Atty. Gen.; Keith Burron, Asst. Atty. Gen.; and Theodore E. Lauer, Director, Prosecution Assistance Program, Patrick M. Plank, Student Intern, for appellee.

Before GOLDEN, C.J., and THOMAS, CARDINE,* MACY, and TAYLOR, JJ.

THOMAS, Justice.

The most significant issue presented by Joseph Steven Tortolito (Tortolito) in this appeal is whether reversible error is to be found in comments upon Tortolito's failure to respond to questions by law enforcement officers. Tortolito presents a litany of other issues including assertions that the testimony of a police officer constituted impermissible vouching for the credibility of the complaining witness; the failure to instruct on a necessarily included lesser offense; a violation of due process in the failure to understand the value of certain evidence and its consequent loss to the defendant, which includes a claim that the State has a duty to preserve the evidence; the failure to instruct the jury it could infer the lost evidence would be favorable to the defendant; and error attributable to joining two separate robberies in one count. We hold there was no impermissible comment upon the silence of the accused in this case, and no other reversible error occurred. The judgment and sentence of the trial court is affirmed.

The following issues are included by Tortolito in his Brief of the Appellant:

I. The prosecutor's repeated comments on Mr. Tortolito's silence in the face of custodial interrogations require reversal.

II. The testimony of a veteran police detective that he knew the crime had been committed constituted an impermissible vouching for the credibility of the complaining witness.

III. The trial court erred by refusing to give a jury instruction on a necessarily included lesser offense.

IV. Under *Arizona v. Youngblood*, 488 U.S. 51, 109 S.Ct. 333, 102 L.Ed.2d 281 (1988), federal due process was violated when Cheyenne police officers knew of the exculpatory value of the evidence before they relinquished control of potentially useful evidence and this loss was caused by a substantial deviation from established norms of criminal investigation.

V. The due process clause of the Wyoming Constitution requires the state to preserve potentially exculpatory evidence.

VI. The fundamental fairness component of due process of law under the Wyoming Constitution was violated when the court refused the defendant's request to instruct the jury that evidence lost by the State or its agents could be inferred as favorable to the defendant and unfavorable to the State.

VII. Mr. Tortolito was denied his state and federal constitutional right to present a defense, and to notice and confrontation, when two separate counts of robbery were merged into one conviction.

In its Brief of Appellee, the State of Wyoming sets forth the issues in this way:

I. Did counsel for the State impermissibly comment upon appellant's silence?

II. Did detective Reese improperly vouch for the credibility of the complaining witness?

III. Did the district court properly refuse to instruct the jury on the crime of larceny?

IV. Was appellant denied due process of law under the United States Constitution when law enforcement officers returned the money to the victim and did not retain it for trial?

V. Was appellant denied due process of law under the Wyoming Constitution when law enforcement officers returned the money to the victim and did not retain it for trial?

VI. Did the district court commit plain error in refusing to give appellant's offered instruction on inferences to be drawn from lost evidence?

VII. Did the district court correctly rule that there was one continuous course

* Retired July 6, 1994.

of conduct, and not two separate crimes of robbery?

On January 20, 1992, Tortolito and his victim became acquainted at the Greyhound bus depot in Cheyenne where they spent time drinking liquor together. They decided to purchase more liquor and walked over the viaduct to a liquor store on the south side. The victim was under the legal drinking age, and he gave $20 to Tortolito to purchase liquor. Tortolito walked to the drive-through window at the liquor store, purchased three bottles of liquor, and pocketed some of the change. They consumed one bottle of liquor and then began to walk back to the bus depot. While they were returning over the viaduct, Tortolito demanded another $20 from the victim. When the victim did not comply, Tortolito became angry and threatened the victim who then gave him a $20 bill. Following that, they returned to the bus depot and went into the restroom. There, Tortolito demanded more money and shoved his victim against the wall when he resisted. Tortolito then took the victim's wallet from his hand, took out a $50 bill, and placed the money in his pocket.

When the opportunity presented itself, the victim left the restroom and informed a bus driver for Powder River Bus Lines that he had been robbed. The bus driver then confronted Tortolito and asked if he had taken money from the victim. Tortolito responded by admitting he had taken the money and stating he wasn't going to give it back. The bus driver then took Tortolito outside the bus depot and asked another employee to summon the police. Officer P arrived in response to the call and was told by the victim that Tortolito had taken from him a $50 bill, a $20 bill, and some change from the purchase of the alcohol. When Officer P asked Tortolito if he had taken the money, Tortolito remained silent. Officer P and Officer H, another law enforcement officer who arrived at the scene, then searched Tortolito and found a $50 bill, a $20 bill, and $11 in smaller bills on his person. After a fray with the officers, Tortolito was placed in custody.

A criminal complaint was filed in Laramie County Court charging Tortolito with robbery. He was tried and convicted of the robbery by a jury on April 15, 1992. A new trial was granted because the trial court concluded Tortolito did not receive a fair trial due to a closing argument on the part of the State suggesting, without supporting facts, that Tortolito had returned stolen merchandise to Wal–Mart for credit. Tortolito was tried a second time and, again, convicted of robbery by the jury on June 23, 1992. He was sentenced to a term of three to five years in the Wyoming State Penitentiary and ordered to pay $50 to the Crime Victims' Compensation Account. He appeals from that judgment and sentence.

■ The primary and major issue in this appeal is whether Tortolito was denied his constitutional rights under the pertinent language of the Fifth Amendment to the Constitution of the United States and Article 1, Section 11 of the Constitution of the State of Wyoming[1] when the law enforcement officers testified about his failure to respond to their questions, and the prosecutor commented on that failure. Relying upon the decisions of this court in *Clenin v. State,* 573 P.2d 844 (Wyo.1978), and *Westmark v. State,* 693 P.2d 220 (Wyo.1984), Tortolito contends reversible error occurred due to comments upon his exercise of his right to silence. The comments relate to his failure to respond to questions by law enforcement officers concerning the theft of money.

Tortolito points to the following portions of the transcript of the testimony of a police officer:

Q. What then happened? Did Mr. Tortolito respond in any way to Officer [P] telling you about Mr. Tortolito taking the money?

A. He didn't say a word.

[DEFENSE COUNSEL]: Your Honor, I'm going to reiterate the objection I made

---

1. *U.S. Const* amend. V provides, in pertinent part:

> [N]or shall he be compelled in any criminal case to be a witness against himself, * * *.

Wyo. *Const* Art. 1, § 11, provides, in pertinent part:

> No person shall be compelled to testify against himself in any criminal case, * * *.

at the side bar conference earlier during opening statement.

THE COURT: Overruled.

Q. Mr. Tortolito didn't say a word in response to "He took money from a passenger inside, a fifty and a twenty?"

A. No, sir, he just stood there.

Q. What happened then?

A. [Officer P] kept talking to him for a couple of minutes, receiving no understandable response. At that time we decided to search his pockets.

\*    \*    \*    \*    \*    \*

Q. What was Officer [P] doing while you were searching in the right pocket of Mr. Tortolito?

A. He was searching Stevie's left pocket.

Q. Did Officer [P] find any money?

A. I believe he did, but I'm not totally certain.

Q. What happened then?

A. Well, he was talking to Stevie, "Where did you get this?" meaning the money I had in my hand.

Q. Who was questioning Stevie, "Where did you get this?"

A. Officer [P].

Q. And did Mr. Tortolito respond?

A. No.

\*    \*    \*    \*    \*    \*

Q. What did you do?

A. I turned and asked him, "Stevie, what did you do with the money?" He said—he didn't say nothing.

\*    \*    \*    \*    \*    \*

Q. How many times do you recall asking Mr. Tortolito if he had indeed taken the money from the passenger?

A. A couple of times.

Q. Did he ever respond.

A. No, he did not.

Q. In any way—yes, no?

A. Just stared at me.

In addition, Tortolito relies upon a portion of the closing argument by the prosecuting attorney:

[Officer P] says, "Where's the victim?" "Well, he's inside." "Bring him out." And so [the victim] was brought out, and he faced Mr. Tortolito and said, "He's the guy that took my money. A 50 and a 20 and he kept some change." He said that it was in his billfold and he had to stare at it to figure it out.

And in the face of that, how is Mr. Tortolito, what does he say? Nothing. He doesn't say, "That's my money."

[Officer H] arrives. "What's going on?" The same thing. "Stevie, where's this man's money?" Did you hear that question asked by Officer [P]? "Stevie, did you take this man's money?" He didn't say anything.

The officers search him and find the money. Officer [P] takes the money, puts it in Stevie's face. "Stevie, did you take this man's money?" And what does he do then? He swings out, trying to grab for the money. That's when the scuffle with Officer [H] then started, into the wall and down on the ground.

Admissions. All of those admissions. "Yeah, I took it, and I'm not giving it back." And the silence in the face of the very clear accusation.

You didn't hear anything about cockatiels then, did you? His mind is clouded with alcohol and he can't think of it.

The record discloses this argument relates to testimony presented on Tortolito's behalf that he had returned two cockatiels to the Wal–Mart store in Cheyenne on the same day and had received a cash refund almost equivalent to the money in Tortolito's possession at the time of the encounter with the police officers.

Tortolito urges that the record demonstrates comment upon his silence; an effort to infer an admission was made because normally, if the accusation were incorrect, some explanation would be offered; and the error is prejudicial *per se*. The State urges the references to Tortolito's silence do not encompass custodial interrogation after a warning of his rights to remain silent and, therefore, the testimony and the argument were permissible. The State essentially contends *Clenin* and *Westmark* have been limited to

custodial interrogation or post-arrest silence by this court's decision in *Summers v. State,* 725 P.2d 1033 (Wyo.1986), *confirmed on reh'g,* 731 P.2d 558 (Wyo.1987), following up on *Brewster v. State,* 712 P.2d 338 (Wyo. 1985).

The tension over the proper judicial method of dealing with a comment upon the silence of an accused person is starkly manifest in the decisions of this court. The rule articulated in *Clenin* was overruled some four years later in *Richter v. State,* 642 P.2d 1269 (Wyo.1982), *overruled by Westmark v. State,* 693 P.2d 220 (Wyo.1984). Two years later, in *Westmark,* the *Clenin* holding was resurrected. Then followed *Brewster,* in which *Westmark* was followed and *Parkhurst v. State,* 628 P.2d 1369 (Wyo.1981), *cert. denied,* 454 U.S. 899, 102 S.Ct. 402, 70 L.Ed.2d 216 (1981), was distinguished on the ground that the jury was not likely to infer an admission of guilt from the defendants' non-responsiveness.

The following year, the issue arose in *Gomez v. State,* 718 P.2d 53 (Wyo.1986), and *Cheatham v. State,* 719 P.2d 612 (Wyo.1986). The facts of *Gomez* were determined to be more similar to those in *Parkhurst* and, consequently, did not amount to a comment upon the exercise of the right of silence. In *Gomez,* 718 P.2d at 56, the court noted that:

> The essential justification for the development of the rule espoused in *Westmark v. State,* supra, is that, once a defendant has been arrested and formally advised of his rights pursuant to *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), what occurs from that point on is inherently equivocal. One cannot tell whether a failure of the defendant to respond is because he is exercising the constitutional right to remain silent about which he has been formally advised, or whether he simply has nothing to say. The Supreme Court of the United States then says that it is inherently unfair to utilize any of the traditional approaches which had permitted the state to call attention to the defendant's failure to speak when an innocent person reasonably would be expected to offer an explanation.

In *Cheatham,* closing argument about the lack of evidence was held not to be a comment upon the exercise of the right of silence in accordance with prior precedent. Later the same year, in *Summers,* this court, although without a clear majority, limited the rule in *Clenin* and *Westmark* to comments relating to the silence of accused "either after his arrest or after he has been advised of his constitutional right to remain silent." *Summers,* 725 P.2d at 1048-49.

The arguments of both parties fail to address the peculiar dynamics of this case. The primary difference in Tortolito's case from those heretofore discussed is that Tortolito made an admissible affirmative admission to the bus driver before the law enforcement officers arrived at the scene. The bus driver testified:

Q. What did you do?

A. I asked Stevie [Tortolito] to come over to where I was and asked him whether he had taken, you know, the money from [the victim], and he said, "Yeah, and you're not going to get it back." Or words to that effect.

Q. This is what Mr. Tortolito is responding to you?

A. Right, to my question about whether he stole the money from [the victim].

At least, in a summary way, that information was known to the officers when they confronted Tortolito.

▮ We perceive the rule to be unassailable, as succinctly stated in 1 WAYNE R. LA-FAVE & JEROLD H. ISRAEL, CRIMINAL PROCEDURE § 6.10, at 541 (West Publishing Co. ed. 1984), that "it is clear that *Miranda* [384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966) ] does not govern interrogation by private citizens acting on their own." The decided cases support this proposition. *E.g., United States v. Pace,* 833 F.2d 1307 (9th Cir.1987), *cert. denied,* 486 U.S. 1011, 108 S.Ct. 1742, 100 L.Ed.2d 205 (1988); *United States v. Webb,* 755 F.2d 382, *reh'g denied,* 762 F.2d 1004 (5th Cir.1985); *United States v. Pullen,* 721 F.2d 788 (11th Cir.1983); *People v. Whitt,* 685 P.2d 1161 (Cal.1984); *People v. Hawkins,* 53 Ill.2d 181, 290 N.E.2d 231 (1972); *Rutledge v. State,* 525 N.E.2d 326 (Ind.1988); *Lipps v. State,* 254 Ind. 141, 258

N.E.2d 622 (1970); *Commonwealth v. Allen*, 395 Mass. 448, 480 N.E.2d 630 (1985); *Commonwealth v. Rodwell*, 394 Mass. 694, 477 N.E.2d 385 (1985); *Commonwealth v. White*, 353 Mass. 409, 232 N.E.2d 335 (1967), *cert. denied*, 391 U.S. 968, 88 S.Ct. 2039, 20 L.Ed.2d 881 (1968); *State v. LaRose*, 286 Minn. 517, 174 N.W.2d 247 (1970); *State v. Bodtke*, 219 Neb. 504, 363 N.W.2d 917 (1985); *State v. Valpredo*, 75 Wash.2d 368, 450 P.2d 979 (1969).

In this instance, we must analyze the significance of the testimony and argument with respect to comment on the claimed right of silence in the context of the affirmative admission of guilt. When we do so in light of the explanation of the essential justification for the *Westmark* rule articulated in *Gomez*, the reports of the police officers become essentially neutral. There was no need for the prosecution to rely upon those as admissions in the presence of the affirmative admission. Were it not for the closing argument of the prosecuting attorney, we would see no need to delve into the intricacies of whether Tortolito was under arrest or was the object of a custodial interrogation so as to require any advice with respect to his constitutional rights.

■ We hold the State is correct in invoking the *Summers* limitation in this instance. The law in this state justifies temporary detention for purposes of investigation. *Collins v. State*, 854 P.2d 688 (Wyo.1993); *Olson v. State*, 698 P.2d 107 (Wyo.1985); *Lopez v. State*, 643 P.2d 682 (Wyo.1982); *Cook v. State*, 631 P.2d 5 (Wyo.1981); and *Rodarte v. City of Riverton*, 552 P.2d 1245 (Wyo. 1976). No duty to furnish a warning of constitutional rights is imposed until the suspect actually is arrested. *Parkhurst*. It is clear advice concerning his constitutional rights had not been furnished but, the record discloses Tortolito was not arrested until a time subsequent to the inquiries by the officers to which he did not respond. *Summers* then establishes that the testimony and argument in this case did not constitute a comment on Tortolito's right to remain silent. In the context of the events occurring subsequently to the affirmative admission, any reports about his failure to respond to questions not only lose their edge, they lose any further significance. Consequently, we have no compunction in holding that, once an accused has made a lawful affirmative admission, the *Westmark–Clenin* rule is not applicable.

■ Turning to the other claims of error raised by Tortolito, we consider first the claim that a police officer vouched for the credibility of the complaining witness. The record discloses the officer was called as a witness for the defense with the purpose of impeaching the testimony of the victim. The testimony about which Tortolito complains occurred upon cross-examination in which the attorney for the State was reviewing with the officer the process of his investigation in a context of a telephone call with the victim. The record discloses:

Q. Again, the purpose of this call to [the victim] to begin with was what?

A. Mainly, it was just to get a general overview of what actually occurred, to see if in fact the officer did make a good decision in making the arrest of Mr. Tortolito, if an actual crime had occurred, and give me a little bit of backup as far as description and so forth, and try to pin point, get in focus the direction to go in the investigation.

After I got off the phone, I knew at that particular time that what he told me generally did match what the officers had put in their reports, and what a couple of witnesses said. So I did know the crime occurred.

An objection was interposed in which Tortolito's attorney invoked *Bennett v. State*, 794 P.2d 879 (Wyo.1990), where the majority of this court concluded that the officer had offered an opinion as to the guilt of the accused. *Bennett* relied upon *Stephens v. State*, 774 P.2d 60 (Wyo.1989), in holding that the officer had offered an opinion as to the guilt of the accused. Tortolito also relies upon *Whiteplume v. State*, 841 P.2d 1332 (Wyo.1992), in which a deputy sheriff stated a crime had occurred when the only information he had was that of the victim.

We perceive Tortolito's case as clearly distinguishable. The testimony of the officer

simply was a summarization of his perceptions after having reviewed reports of officers who were at the scene and after visiting with the victim on the telephone. It is far removed from a statement that Tortolito was guilty, although given the tenor of the case-in-chief, that fact was probably obvious at that point in the trial. Furthermore, since it was made in the context of information other than that acquired from the victim, it cannot be perceived as a vouching for the credibility of the victim, contrary to the teaching of *Stephens* and *Zabel v. State*, 765 P.2d 357 (Wyo.1988). In context, it is very similar to the answer by the examining physician in *Montoya v. State*, 822 P.2d 363, 365 (Wyo. 1991), where the witness stated, "Yes. I came to an assessment that there was sexual molestation." We find no error with respect to this contention by Tortolito.

■ Tortolito's third claim of error relates to the refusal of an instruction on what he asserts is a lesser included offense, larceny in violation of WYO.STAT. § 6–3–402 (1988). Based upon the statutory language, larceny certainly has the potential of being an included offense in the crime of robbery. In defining robbery, WYO.STAT. § 6–2–401 (1988) states:

(a) A person is guilty of robbery if in the course of committing a crime defined by W.S. 6–3–402 he:

    \*    \*    \*    \*    \*    \*

(ii) Threatens another with or intentionally puts him in fear of immediate bodily injury.

It is obvious the elements of the offenses are identical except for the additional element provided in the robbery statute. Recently, in *Keffer v. State*, 860 P.2d 1118 (Wyo.1993), we clearly adopted the statutory elements test with respect to lesser included offenses. We cannot, however, avoid the proposition articulated in *State v. Selig*, 635 P.2d 786 (Wyo.1981), *abrogated by Keffer v. State*, 860 P.2d 1118 (Wyo.1993), which is alluded to in *Keffer*, that such an instruction is not proper if there is no basis in the evidence to distinguish the two offenses. In *Keffer*, we pointed to the cases in the Supreme Court of the United States, including *Sansone v. United States*, 380 U.S. 343, 85 S.Ct. 1004, 13 L.Ed.2d 882 (1965); *Berra v. United States*, 351 U.S. 131, 76 S.Ct. 685, 100 L.Ed. 1013 (1956); *Sparf v. United States*, 156 U.S. 51, 15 S.Ct. 273, 39 L.Ed. 343 (1895), in which the Supreme Court justified the rule that the evidence must permit a distinction.

■ Endeavoring to bring himself within the rule of *Selig*, Tortolito argues robbery is a specific intent crime, and intoxication can be relied upon to negate that intent. Tortolito then argues this evidence puts the proof of the elements differentiating the two crimes sufficiently in dispute. The fallacy in this approach, however, is that the specific intent, which is required for commission of the crime of robbery, is the same specific intent required for the commission of the crime of larceny, that is "with intent to deprive the owner or lawful possessor." Consequently, we hold the trial court committed no error in refusing to give the lesser included offense instruction in this case. It is clear there was no evidence the crime was committed without the threat, or putting the victim in fear, of immediate bodily injury.

■ In his next assertion of error, Tortolito insists he was deprived of due process because the police officers knew the exculpatory value of the money they confiscated from Tortolito and returned to the victim. The fulcrum of this argument is that forensic testing could have established the presence or absence of the victim's fingerprints on the money, and their absence would have served as exculpatory evidence. This argument is closely tied to Tortolito's next argument that the Wyoming Constitution in Article 1, Section 6 (due process of law) requires the preservation of potentially exculpatory evidence; and the follow-up, in the succeeding assertion of error, is that there was a deprivation of due process when the court refused to instruct the jury that evidence lost by the State or its agents could be inferred as favorable to the accused and unfavorable to the State.

There is nothing in this record supporting Tortolito's assertion that forensic tests could establish the presence or absence of the victim's fingerprints, other than the arguments made by Tortolito. Consequently, the record

does not trigger the test of *Arizona v. Youngblood*, 488 U.S. 51, 58, 109 S.Ct. 333, 337, 102 L.Ed.2d 281 (1988), *reh'g denied*, 488 U.S. 1051, 109 S.Ct. 885, 102 L.Ed.2d 1007 (1989), to the effect that:

> We therefore hold that unless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law.

Even if, for purposes of argument, we assume that the evidence had some potential to be useful to Tortolito, nothing seems to manifest any bad faith on the part of the officers.

■ We most recently analyzed similar claims in *Young v. State*, 849 P.2d 754 (Wyo. 1993). We relied not only upon *Youngblood*, but also upon *California v. Trombetta*, 467 U.S. 479, 104 S.Ct. 2528, 81 L.Ed.2d 413 (1984), and *United States v. Agurs*, 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976). We also relied upon our decisions in *Miller v. State*, 830 P.2d 419 (Wyo.1992); *Gale v. State*, 792 P.2d 570 (Wyo.1990); *Wilde v. State*, 706 P.2d 251 (Wyo.1985); and *Pote v. State*, 695 P.2d 617 (Wyo.1985), cases cited by Tortolito. We are satisfied Tortolito's claims of error relating to the failure to preserve the bills returned to the victim and the claim of error in refusing to instruct the jury on the inference that lost evidence would be favorable to Tortolito and unfavorable to the State are controlled by our decision in *Young*.

The record, as distinguished from Tortolito's arguments, simply fails to justify the constitutional materiality of the money returned to the victim. In *Young*, we rejected a requested instruction like that sought by Tortolito, holding the instruction called for conjecture by the jury, and there was no abuse of discretion in failing to give the instruction. We are satisfied the same justification for the trial court's refusal exists in this case.

■ Turning to Tortolito's last claim that he was denied his right to present a defense and to notice and confrontation because two separate counts of robbery were merged into one conviction, we cannot perceive any basis for a claim of prejudice. Certainly, the separate acts Tortolito points to were part of the same course of conduct with a single victim. These events occurred within a few minutes of each other, and the purpose of Tortolito in attempting to secure all of the victim's money through force is apparent. It seems odd Tortolito is contending the events should have been charged separately because, if they had been, he would have been subject to two punishments, instead of one. In this instance, there was only one victim, and the continuous transaction concept is present. In these respects, it is similar in its factual tenor to *State v. Grandbouche*, 32 Wyo. 88, 230 P. 338, *reh'g denied*, 32 Wyo. 88, 233 P. 532 (1924). It is distinguishable from *McInturff v. State*, 808 P.2d 190 (Wyo.1991), upon which Tortolito relies because, in *McInturff*, there were three burglaries of three cars owned by different individuals, and they occurred over a period of seven days. In the same respects, it is distinguishable from *Edelhoff v. State*, 5 Wyo. 19, 36 P. 627 (1894).

■ In our judgment, the California Court of Appeals correctly established the parameters of analysis in *People v. Howes*, 99 Cal.App.2d 808, 222 P.2d 969 (1950), in which it was confronted with a question of whether a series of thefts constitutes one offense or a series of offenses. The court there said:

> From these cases, and others that could be cited, it can be said that the general test as to whether there are separate offenses or one offense is whether the evidence discloses one general intent or discloses separate and distinct intents. The particular facts and circumstances of each case determine this question. If there is but one intention, one general impulse, and one plan, even though there is a series of transactions, there is but one offense, and this is so whether the theft is accomplished by larceny or embezzlement.

*Howes*, 222 P.2d at 976.

To that wisdom, we would add simply "or whether the offense is accomplished by robbery."

We are satisfied no reversible error occurred in connection with Tortolito's trial. There was no impermissible comment upon the silence of the accused, and the other

claims of error are not persuasive. The judgment and sentence of the trial court is affirmed.

GOLDEN, Chief Justice, dissenting, with whom TAYLOR, J., joins.

I must respectfully dissent from the majority's decision on the issues presented by the prosecutor's comment upon silence and the officer's vouching for the credibility of the alleged victim.

Controlling precedent with respect to the first issue clearly holds that an accused's right to remain silent under Art. 1, § 11 of the Wyoming Constitution does not depend upon the accused's being advised of that right, but exists by virtue of the constitutional language. This rule of law is, of course, from *Westmark* and *Clenin*. *Summers* was not a majority opinion but only a two-justice plurality and is not controlling law. We, therefore, must look to *Westmark* and *Clenin* for our applicable rule.

As our law is based upon the more stringent protections of our own state constitution and having carefully read *Summers, Westmark, Clenin, Brewster, Cheatham, Richter, et al.*, I believe this court would do well to remember the views of Justices Rooney and Raper who, in their specially concurring opinion in *Summers*, said:

> The constitutional right to silence exists at all times—before arrest, at arrest and after arrest; before a *Miranda* warning and after it. If there is a presumption relative to the exercise of the right, it should be in favor of its exercise and not to the contrary. An impermissible comment on the exercise of the right is error, the only question being whether or not the comment is reversible error—i.e., whether or not it is harmless error.

*Summers v. State*, 725 P.2d 1033, 1050 (Wyo. 1986). Justices Rooney and Raper advocated a harmless error rule; their position did not prevail and has not prevailed.

In my view, the rule from *Westmark* and *Clenin* is that prosecutorial comment upon either pre-arrest or post-arrest silence is reversible error.[1] However, having carefully read the pertinent portions of the record relating to Tortolito's encounter with the police at the bus station, I believe the majority not only erred in determining that *Summers* controlled in this case, it erred in determining that Tortolito was not under arrest and his freedom of movement was not restrained in a significant way.

The record shows Tortolito was temporarily detained when one police officer answered the call at the bus station that night, knew Tortolito was the subject of the call and restrained Tortolito upon his arrival as Tortolito attempted to walk away when he spotted the officer. While holding Tortolito up against the wall, the officer asked the bus driver what had happened and was told that Christian had accused Tortolito of taking Christian's money. The officer asked Tortolito if he had taken the money and testified that Tortolito did not respond.

The officer then described how Christian was brought outside and also accused Tortolito of taking money from him. The officer's actions and even his question to Tortolito are proper investigatory conduct during temporary detention and required no *Miranda* warning. However, the prosecutor's question to elicit the response about Tortolito's silence is factually similar to what occurred in *Parkhurst*. Because it was the only reference by the *Parkhurst* prosecutor, we held no error had been committed. *Parkhurst v. State*, 628 P.2d 1369, 1382 (Wyo.1982). In Tortolito's trial, however, the prosecutor had already referred to the silence in his opening statement. The defense objected, but was overruled. Unfortunately, Tortolito's prose-

---

1. Before the doubt injected by *Summers*, our law could be summarized as "the right to remain silent is always with you." In *Clenin*, we stated that advice of the right to remain silent only serves the purpose of *expanding* its protection by assuring that the accused person is aware of it. This language coupled with *Clenin's* holding clearly establishes that it is unnecessary to distinguish between pre-arrest silence and post-arrest silence once this court concludes there has been a comment upon an accused's exercise of his right of silence. *Westmark* involved instances of prosecutorial comment on both pre-arrest and post-arrest silence and declared comments on either to be impermissible. *Westmark*, 693 P.2d 220, 221, 225 (Wyo.1984). Despite *Summers*, our decisions clarify that Wyo. Const. art. 1, § 11 *is* self-executing.

cutor proceeded to use Tortolito's silence as proof of guilt, intentionally and flagrantly.

After Christian's accusation, another officer (second) arrived on the scene, positioned himself on the other side of Tortolito and helped to hold him up against the wall. The first officer informed the second that "Stevie had taken money from a person inside." The second officer testified that the first officer continued to question Tortolito for a couple of minutes, and after receiving no understandable response from Tortolito, both officers decided to search his pockets. There is little question that this was custodial interrogation followed by an arrest and search incident to arrest. Apparently, the officers also believed that Tortolito was not free to leave, since Tortolito tried to leave, was seized, injured, and then handcuffed.

Understanding that Tortolito's detention rapidly became custodial interrogation followed by an arrest and search before any magical words of "you are under arrest" were uttered is critical in analyzing the prosecutor's use of Tortolito's silences. The record shows that during the second officer's testimony of how Tortolito came to be arrested, the prosecutor asked, "Did Mr. Tortolito respond in any way to Officer Pederson telling you about Mr. Tortolito taking the money?" The second officer responded that "he didn't say a word." The defense objected, was overruled and the prosecutor immediately asked "Mr. Tortolito didn't say a word in response to 'he took money from a passenger inside, a fifty and a twenty'?" and again received the desired answer of "No, sir, he just stood there." After the second officer testified that the first officer continued to question Tortolito, he testified that Tortolito was searched and money was found. Con-

tinuing, the officer testified that the officers again asked Tortolito "where did you get this?" and the prosecutor again asked "And did Mr. Tortolito respond?" to which the officer responded, "No."

The prosecutor's questions of just this police officer, second on the scene, elicited four answers that Tortolito was silent in the face of accusations. The prosecutor repeated these questions to the first officer and received five answers that Tortolito was silent in the face of accusations. The prosecutor mentioned this silence once in his opening statement. The prosecutor mentioned this silence in his closing argument and characterized it as an admission.[2] Tortolito's silences were used as a major part of the prosecution's substantive evidence of guilt and constituted impermissible comment upon silence.

In the face of this court's controlling precedent, the majority opinion seeks to justify its position by considering the comment-on-silence issue in the context of Tortolito's admission of guilt made to the bus driver (or bus depot agent) before the police arrived. That piece of evidence somehow magically erases from our consideration the prosecutor's egregious impermissible comment on Tortolito's silence.

Without citation of authority, the majority boldly declares that, because of Tortolito's earlier admission to an ordinary citizen, the prosecution's quite substantial impermissible comments on Tortolito's silence in the face of a barrage of police accusations which followed the admission to the ordinary citizen, lose both their edge and significance. Without citation of authority, the majority then announces a new rule: once the accused makes a lawful affirmative admission to an

---

2. As part of his closing argument, the prosecutor wrote out "five factors." Those factors were motive, opportunity, physical evidence, admissions, and alibi. When discussing admissions, the prosecutor described Tortolito's silence in the face of accusations by the bus driver and victim and finally the police:

> And in the face of that, how is Mr. Tortolito, what does he say? Nothing. He doesn't say, "That's my money."
>
> Officer Hill arrives. * * * "Stevie did you take this man's money?" He didn't say anything.

> The officers search him and find the money. Officer Pederson takes the money, puts it in Stevie's face. "Stevie, did you take this man's money?" And what does he do then? He swings out, trying to grab for the money. That's when the scuffle with Officer Hill then started, into the wall and down on the ground.
>
> Admissions. All of those admissions. "Yeah, I took it, and I'm not giving it back." And the silence in the face of the very clear accusation.

ordinary citizen, the *Westmark–Clenin* rule is not applicable. The majority does not explain why this should be so. I strongly disagree with such a rule. That is not and should not be the rule of this court if fairness, justice and due process of law are to mean anything to our citizens. The majority by this sleight of hand has, without explanation, changed the landscape; it has swiftly killed the reversible error rule and given birth to the harmless error rule contrary to our established precedent.

I must also dissent to the majority's holding that no error occurred during the testimony of a veteran police detective called by the defense. This detective had been assigned to investigate the police officer's report of the incident. The day after the incident, the detective called Christian and interviewed him. The answers the detective received from Christian were different from Christian's testimony, and the detective was called by the defense to testify about those discrepancies. On cross-examination, the prosecutor elicited responses designed to show that Christian's discrepancies occurred for the reasons that the detective had not conducted a detailed interview, the detective believed the trauma of the incident had left Christian "confused," and the detective's purpose was only to obtain a general overview of the incident. The prosecutor and detective succeeded in accomplishing those objectives in the exchange quoted by the majority.

However, the detective then exceeded the scope of the question with a response well beyond simply summarizing the facts of his investigation. He provided the jury this ultimate conclusion:

> [He] knew at that particular time that what he told me generally did match what the officers had put in their reports, and

what a couple of witnesses said. So I did know the crime occurred.

As defense counsel pointed out, the detective was called as a defense witness to "cast doubt on Mr. Christian's testimony." Given the entire line of questioning by both parties, it would be clear to an experienced [3] detective that his expansive answer had the purpose of endorsing the complaining witness' credibility. This answer vouched for Christian's credibility in violation of *Whiteplume v. State*, 841 P.2d 1332, 1341 (Wyo.1992); *Bennett v. State*, 794 P.2d 879, 881 (Wyo.1990); *Stephens v. State*, 774 P.2d 60, 68 (Wyo.1989).

I agree that this case can be distinguished from *Bennett* and *Whiteplume*,[4] but find the detective's departure from testifying about the facts of his investigation to voluntarily offering a helpful conclusion to the jury was unwarranted and constituted error *per se*. *Bennett*, 794 P.2d at 882.

---

3. The police officer was assigned to the detective division and had been an officer since October of 1981.

4. In *Bennett*, we determined that a police officer's statement that the defendant was a drug dealer was an opinion the defendant was guilty. Concluding it was impossible to determine the prejudicial effect of the statement, we found the testimony error per se and reversed the conviction. *Bennett* 794 P.2d at 882–83. In *Whiteplume*, this court determined that an experienced police officer's statement that his interview of the complaining witness caused him to conclude the crime had occurred was reversible error because of its prejudicial impact upon the jury. That determination was made after examining all circumstances surrounding the dynamics of the trial where the complaining witness' credibility was at issue, and there was little physical evidence or other witness testimony.